(No. 14375.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM BROSS LLOYD *et al.* Plaintiffs in Error.

*Opinion filed June 21, 1922—Rehearing denied October 5, 1922.*

1. CRIMINAL LAW—*State may enact laws to punish disloyalty to national government.* The Federal constitution does not grant to the Federal government the exclusive right to punish disloyalty, and as each State is a part of the nation and owes a duty to support the efforts of the national government to secure the safety and protect the rights of citizens, it may require its citizens to refrain from any act which will interfere with the national government in defending itself against public enemies.

2. SAME—*police power of State may be exercised to suppress conspiracies against the government.* Under its police power the State may enact laws forbidding the open advocacy of a doctrine designed to overthrow the government even though there is no present and imminent danger of the success of the plan advocated, and the State may assume that the declarations of conspirators advocating such a plan are sincere and may proceed to suppress the conspiracy without waiting until there is an actual attempt to carry out the program advocated.

3. SAME—*extent of legislative power of the States.* Each State, when not restrained by its own fundamental law or by the supreme law of the land, possesses all legislative power consistent with a republican form of government, and it has power to provide by legislation not only for the protection of the health, morals and safety of its people, but for the common good, as involved in the well-being, peace and prosperity of the people.

4. SAME—*terms of act of 1919 to prevent spreading of doctrines advocating violent overthrow of the government are not uncertain.* The act of June 28, 1919, (Laws of 1919, p. 420,) making it a felony to advocate openly the overthrow of the existing form of government by violent means, is not uncertain in its terms and has no double meaning that will in any way deceive the common mind; and as the legislative intent is clearly expressed by the language used it is not material whether the language is strictly accurate.

5. SAME—*what constitutes an unlawful means of changing form of government.* The constitution clearly provides the lawful means by which the existing form of government may be reformed or changed, and any means other than those provided are unlawful.

6. SAME—*when advocating violent overthrow of government is unlawful as disturbing the public peace.* Conduct advocating the

violent overthrow of the government may be regarded as disturb-ing the public peace if the means advocated are apparently adapted to the end, even though, in fact, they are not so adapted; but acts which are too trivial for the law's notice and which create no ap-parent danger and no perturbation in the peaceful order of things are not criminal.

7. SAME—*what constitutes due process of law.* Due process of law, within the meaning of the constitutional provision, is law in its regular course of administration through courts of justice, and it is secured by laws which operate on all alike and which do not subject the individual to the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.

8. SAME—*nature, character and extent of penalty are for the legislature.* The nature, character and extent of penalties are mat-ters for the legislature, which may prescribe definite terms of im-prisonment or specific amounts as fines or fix the maximum or minimum limits of either, and the courts cannot interfere unless there has been a great departure from the fundamental law and the spirit and purpose thereof or the penalty is manifestly in ex-cess of constitutional limitations.

9. SAME—*act of 1919 to punish advocating the violent over-throw of government is valid.* The act of June 28, 1919, (Laws of 1919, p. 420,) amending the Criminal Code by the addition of new sections making it a felony to openly advocate the violent overthrow of the existing form of government, does not violate section 13 of article 4 of the constitution, with reference to the titles of acts.

10. SAME—*when provision of statute is void because not ex-pressed in title.* To render a provision in the body of an act void as not embraced in the title, such provision must be incongruous or must have no proper connection with or relation to the title, and it is not objectionable if by any fair intendment the provi-sion has a necessary and proper connection with the title.

11. SAME—*act of 1919 is not invalid as limiting the right of free speech.* The act of 1919, (Laws of 1919, p. 420,) making it a felony to openly advocate the violent overthrow of government, is not an unconstitutional limitation of the right of free speech, as it is clearly an attempt to prohibit the abuse of such right; and the wisdom or propriety of such legislation is not a question for the courts.

12. SAME—*effect where some of the defendants charged with spreading of doctrines advocating the overthrow of government are aliens.* In a prosecution for conspiracy under the act of 1919,

(Laws of 1919, p. 420,) making it a felony to openly advocate the violent overthrow of government, the fact that some or most of the parties with whom the defendants conspired and consorted were aliens and owed no allegiance to the government does not affect the sufficiency of the indictment.

13. SAME—*conspiracy is complete when the unlawful combination or agreement is made.* The essence of the offense of conspiracy is not the accomplishment of the unlawful object but it is the unlawful combination or agreement to accomplish the criminal or unlawful purpose, and the conspiracy is complete when the agreement to do the thing forbidden by law has been made, regardless of any subsequent interruption of the effort to carry out the object of the conspiracy.

14. SAME—*when indictment sufficiently states nature of the offense.* An indictment which charges the offense substantially in the language of the statute is sufficient, and it is not necessary that the language be grammatically exact if the offense with which the defendants are charged is stated plainly enough to be readily understood by the jury and to enable the defendants to properly prepare their defense.

15. SAME—*when indictment for conspiracy to commit felony sufficiently describes the felony.* In an indictment for a conspiracy to commit a felony it is necessary only to designate the felony by such description as will apprise the defendants of the exact charge upon which they will be tried, and it is not required that the felony be described with the same accuracy as is required in an indictment for the felony itself.

16. SAME—*it is unlawful at common law to advocate violent overthrow of government.* An indictment for conspiracy under a statute making it a felony to advocate the violent overthrow of government may properly contain common law counts, as it is unlawful at common law to advocate the overthrow of the established government by force.

17. SAME—*one good count will support a general verdict.* One good count in an indictment will support a general verdict of guilty.

18. SAME—*necessity and character of bill of particulars rest in discretion of trial court.* Whether the State shall be required to furnish a bill of particulars in a particular case, and the character and extent of such a bill if required, rests in the discretion of the trial court, and it is only in cases where it is clear that there has been an abuse of this discretion that the action of the trial court in denying a part or all of the request will be held to be error.

19. SAME—*when bill of particulars is sufficient.* In a trial for conspiracy under the act of 1919, making it a felony to openly ad-

vocate the violent overthrow of the government, the court may require the State to furnish the defendants a copy of the books, papers and documents which are to be introduced in evidence against them, but the court may refuse to require the State's attorney to inform the defendants of the meaning of the words used in the indictment, which follows the language of the statute, and to give the defendants a particular description of the kind and nature of the "flags, banners, emblems and other insignia" mentioned in the indictment.

20. SAME—*what acts are admissible to show intent in trial for conspiracy under act of 1919.* In a trial for conspiracy under the act of 1919, making it a felony to openly advocate the violent overthrow of the government, evidence of acts and statements of some of the defendants at a convention prior to July 1, 1919, when the act took effect, is admissible to show the intent of the defendants in using the same words and phrases in advocating the illegal doctrines of an organization of which they became members after the act took effect.

21. SAME—*what is sufficient to prove common design in trial for conspiracy.* Although the common design to do the unlawful act is the essence of the charge of conspiracy, it is not necessary to prove that the conspirators came together and actually agreed in terms to have that design and to pursue it by common means; and it is not necessary to prove that the conspiracy originated with any part or all of the defendants, as every person entering into a conspiracy or common design already formed is deemed in law a party to all acts done by any of the parties, before or afterwards, in furtherance of the common design.

22. SAME—*what papers and documents are admissible in prosecution for conspiracy to overthrow the government.* In a prosecution under the act of 1919 for a conspiracy to overthrow the established government, documents and newspapers published by any one of the defendants in furtherance of the common design are admissible in evidence against all the defendants, as any act or declaration of a member of a conspiracy is, in contemplation of law, the act and declaration of all the members and is admissible against each of them.

23. SAME—*conspiracy to overthrow government is criminal regardless of number of conspirators.* The fact that a conspiracy to overthrow the government by violent means has assumed world-wide proportions does not change the criminal character of the conspiracy.

24. SAME—*when participation in unlawful organization is sufficient to convict defendants of conspiracy to overthrow government.* While guilt is personal and individuals cannot be condemned

for mere membership in party organizations in whose unlawful activities they have no part, yet in a prosecution under the act of 1919 for conspiracy to overthrow the government by violent means, evidence that the defendants took an active part in the organization and advancement of the cause of the party through which they advocated their illegal doctrines is sufficient to prove conscious guilt.

25. SAME—*in prosecution for conspiracy the existence of criminal intent is a question of fact for jury.* In a prosecution for conspiracy the criminal quality of the common design resides in the intention of the parties, construed in connection with the purpose contemplated, and as the accused may deny any criminal intent the question of intent becomes one of fact for the jury.

26. SAME—*when evidence of acts of other parties is admissible in a prosecution for conspiracy to overthrow government.* In a prosecution for conspiracy under the act of 1919, making it a felony to openly advocate the violent overthrow of the government, it is proper, on the question of the criminal intent of the defendants, to prove what was said and done by leaders of a strike in another section of the country, to which the publications and statements of the defendants refer as the "new tendency" or method advocated by them for the overthrow of the government by a general strike.

27. SAME—*judgment of conviction will not be reversed if based on evidence establishing guilt beyond reasonable doubt.* The purpose of a reviewing court is not to determine whether the record is perfect but to determine whether the accused has had a fair trial under the law, and a judgment of conviction will not be reversed if it is based on competent evidence establishing guilt beyond a reasonable doubt, even though harmless errors were committed in the admission or rejection of evidence and in the giving and refusing of instructions.

28. SAME—*a conspiracy to overthrow government by a general strike is unlawful.* A conspiracy to overthrow the government now secured to the people by forcing them to submission by the suffering that would necessarily follow a general strike is unlawful.

29. SAME—*when act of State's attorney does not compel defendant to give evidence against himself.* A statement by the assistant State's attorney, preparatory to producing a photostatic copy of an envelope mailed by one of the defendants, calling the court's attention to the fact that he had served notice on said defendant and his counsel to produce the original, and at the same time calling upon them to produce it in court, does not amount to compelling the defendant to give evidence against himself, in violation of his constitutional privilege.

30. SAME—*what argument of counsel for prosecution is legiti-mate*. Arguments of counsel based upon facts appearing in the proof or on legitimate inference deducible therefrom do not tran-scend the bounds of legitimate debate and are not to be discounte-nanced by the courts, and it is not improper for a prosecuting at-torney to reflect unfavorably on a defendant or to denounce his wickedness, and even indulge in invective within the limits of pro-priety, if such argument is based on evidence competent and per-tinent to the issue to be decided by the jury.

31. SAME—*what authorities may be read to jury during argu-ment*. Only the decisions of courts of last resort or the opinions of approved text books may be read to the jury during the argu-ment, and the trial court is not obliged to allow the reading to the jury of numerous authorities or the unnecessary consumption of time in discussing such authorities, but the court has a clear right to keep the reading of law to the jury within reasonable limits.

32. SAME—*when defendants are properly sentenced under sec-tion 46 of Criminal Code, as amended June 28, 1919*. Defendants convicted of conspiracy subsequent to the enactment of June 28, 1919, amending section 46 of the Criminal Code, (Hurd's Stat. 1921, p. 1068,) are properly sentenced under said amendment; and the fact that another amendment of the same section, approved two days later, failed to provide the same penalty does not amount to a repeal of the penalty provision of the former amendment and the re-enactment of the penalty theretofore existing, as both amend-ments were enacted at the same session and the legislature must be held to have intended to enact two separate and unrelated laws.

33. STATUTES—*what may be considered in construing a statute*. In construing an act of the legislature it is proper to consider the title of the act, the objects to be accomplished, other provisions found in connection with those under consideration, the provisions and arrangement of amended statutes, the mode in which the em-barrassment was introduced, as shown by the journals and records, and the history of the legislation.

34. SAME—*when amended statute is not to be regarded as a new law*. Where the legislature enacts an amendatory statute provid-ing that a certain act shall be amended so as to read as repeated in the amendatory act and no change is made in the wording of the old act, such portions of the old law as are repeated, either literally or substantially, in the new act are to be regarded as a continuation of the old law and not the enactment of a new law on the subject.

CARTER, J., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. OSCAR HEBEL, Judge, presiding.

WILLIAM S. FORREST, and WILLIAM A. CUNNEA, for plaintiff in error William Bross Lloyd; WILLIAM S. FORREST, for plaintiff in error Karl F. Sandberg; and CLARENCE S. DARROW, for other plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (LLOYD D. HETH, HENRY A. BERGER, MARVIN E. BARNHART, EDWARD E. WILSON, and FRANK COMERFORD, of counsel,) for the People.

Mr. CHIEF JUSTICE THOMPSON delivered the opinion of the court:

Thirty-nine members of the communist labor party were indicted by the March, 1920, grand jury of the criminal court of Cook county for conspiracy. Twenty of them were arrested, tried and convicted. Two of those convicted were not sentenced,—Max Bedacht, of San Francisco, who failed to appear for sentence, and Edwin Firth, who died before judgment was entered. The eighteen who were sentenced on the verdict are plaintiffs in error here. They are, William Bross Lloyd and Arthur Procter, each sentenced to imprisonment in the penitentiary and to pay a fine of $2000, Jack Carney, sentenced to imprisonment in the penitentiary and to pay a fine of $1000, L. E. Katterfeld, L. K. England, Ludwig Lore, Edgar Owens and Niels Kjar, each sentenced to imprisonment in the penitentiary, and Perry Shipman, Karl F. Sandberg, Oscar Jesse Brown, N. J. Christensen, Samuel Ash, James A. Meisinger, Samuel F. Hankin, John Vogel, Morris A. Stolar, and Charles Krumbein, each sentenced to imprisonment in the county jail for one year.

The felonies and unlawful acts which it is charged plaintiffs in error conspired to commit are those created by the

act of June 28, 1919, which declares that it shall be unlawful for any person "openly to advocate by word of mouth or writing the reformation or overthrow by violence or any other unlawful means of the representative form of government now secured to the citizens of the United States and the several States by the constitution of the United States and the constitutions of the several States," "to publish, issue or knowingly sell or distribute any book, paper, document or other written or printed matter which advocates crime and violence as a means of accomplishing the reformation or overthrow of the constitutional representative form of government so secured to the citizens of the United States and the several States," "to organize, aid in the organization of, or become a member of any society or association, the object of which is to advocate the reformation or overthrow of the existing form of government by violence or any other unlawful means," and "to display or exhibit at any meeting, gathering or parade, public or private, any flag, banner, emblem or other insignia, symbolizing or intending to symbolize a purpose to overthrow by force or violence or by physical injury to person or property, of the representative form of government now secured to the citizens of the United States and the several States by the constitution of the United States and the constitution of the State of Illinois," and that any person who shall do any of the acts forbidden shall be deemed guilty of a felony. The act further declares that it shall be unlawful for any person "voluntarily and with knowledge of the purpose of such meeting or assembly to be present at any meeting or assembly, at which the reformation or overthrow of the existing form of government by crime and violence is advocated," and that any person who attends such a meeting shall be deemed guilty of a misdemeanor. (Laws of 1919, p. 420.)

Plaintiffs in error contend, that every section of said act is invalid for the reason that the General Assembly of

Illinois does not have the power and authority to make unlawful and punishable the advocacy of the reformation or overthrow of all or of any separable part of the constitutional representative form of government of the United States of America, or the constitutional representative form of government of all or any one of the other forty-seven several States of the United States, and that the Congress of the United States is the only legislative body in the United States, if any, which has the power and authority to make such advocacy unlawful and punishable. This contention is based in part at least on the argument that the power and authority to "guarantee to every State in this. Union a republican form of government" and to "protect each of them against invasion" are lodged by section 4 of article 4 of the constitution of the United States exclusively in the United States. This contention is not sound. The citizens of this State are citizens of the United States, and the citizens of the United States residing within the borders of this State are citizens of this State. Each citizen owes a duty to these two separate sovereignties. The State is a part of the nation and owes a duty to the nation to support the efforts of the national government to secure the safety and protect the rights of its citizens, and to preserve, maintain and enforce the sovereign rights of the nation against public menace, and to that end the State may require its citizens to refrain from any act which. will interfere with or impede the national government in effectively defending itself against such public enemies. It is the duty of all citizens of the State to aid the State in performing its duty as a part of the nation, and the fact that such citizens are also citizens of the United States and owe a direct duty to the nation does not absolve them from their duty to the State or preclude the State from enforcing such duty. (*State* v. *Holm,* (Minn.) 166 N. W. 181, L. R. A. 1918C, 304; *Dunne* v. *People,* 94 Ill. 120; *State* v. *Kahn,* (Mont.) 182 Pac. 107; *State* v. *Hennessy,* (Wash.)

195 Pac. 211.) The phrase, "the representative form of government now secured to the citizens of the United States and the several States by the constitution of the United States and the constitutions of the several States," is the description of a form of government familiar to every high school boy and girl in the State. The United States of America, the State of Illinois, and each and every one of the other forty-seven States of the United States is a representative democracy, and the government of each is a republican form of government. Each and every one of these forty-nine sovereignties has a written constitution guaranteeing that the residents of the several sovereignties, citizen or alien, shall not be deprived of life, liberty or property without due process of law. There is embodied in the constitution of the United States and the constitution of each of the forty-eight States a bill (or declaration) of rights, guaranteeing to every citizen, among other things, the right of private ownership of property, and the right of each individual to use and enjoy his property. The fundamental principles upon which each of the governments of these forty-nine sovereignties is established are the same, and the form of government of each is and has been the same since they were severally established. The advocacy within any one of the several States to overthrow the representative form of government of the United States, or of the several States, is therefore an assault upon the established government of each and every one of the forty-nine separate sovereignties, and it would be strange indeed if any one of these sovereignties did not have the right to protect itself against destruction. The overthrow of the national government would be a direct blow at the representative form of government now secured to each of the several States, and the overthrow of the government of any one of the several States would be an indirect assault upon the government of each of the other forty-seven States. The State of Illinois is therefore interested in the preser-

vation of our national government and the government of each and every one of her sister States, and she, without doubt, has the right under the police power inherent in every government to enact laws for the preservation and protection of her government. Each State, when not restrained by its own fundamental law or by the supreme law of the land, possesses all legislative power consistent with a republican form of government, and it therefore has power and authority to provide by legislation, not only for the protection of the health, morals and safety of its people, but for the common good, as involved in the well-being, peace and prosperity of its people. When, by its legislation, a State encourages a feeling of patriotism toward the nation, it necessarily encourages a like feeling toward the State. There is nothing in the Federal constitution in any way granting to the Federal government the exclusive right to punish disloyalty. *Halter* v. *State,* 205 U. S. 34, 27 Sup. Ct. 419; *Gilbert* v. *State,* 254 U. S. 325, 41 Sup. Ct. 125.

It is next contended, that every section of the act is invalid and void because of the uncertainty, ambiguity and repugnancy that appear in the essential words thereof, and every error of grammar and rhetoric is pointed out and argued at length. It is argued that the act is ambiguous because its language makes it a felony to reform and overthrow our form of government, whereas a form of government cannot be overthrown. This objection is too fanciful to appeal to a reasonable mind. The legislative intent is clearly expressed by the language used, and whether the language is strictly accurate is not material. It is also argued that the word "now" used in the act in the phrase "now secured," and the word "existing" used in the phrase "existing form," render the act ambiguous, because they create a doubt as to whether the act means the representative form of government as it existed on the day on which the act became a law, or as it may exist from time to time on the divers days on which said act may be violated. As

304–3

we said in the preceding paragraph, the representative form
of government now existing in the United States and the
several States of the United States, and now secured to
the citizens of these sovereignties, is the same form of gov-
ernment that has existed in this country since the constitu-
tion of the United States became the law of the land, and
that form of government will always remain in force until
that constitution is destroyed or replaced by another, es-
tablishing a different form of government. It is further
argued that there is uncertainty and repugnancy in the
phrases, "violence or any other unlawful means," "crime
and violence," and "force or violence or physical injury to
person or property," the contention being that the word
"violence" appearing in each of the phrases is given a dif-
ferent meaning in each phrase because of the words with
which it is associated. We experience no difficulty in gath-
ering the legislative intent from the language used by the
legislature, but we must confess that we experience unusual
difficulty in grasping the highly technical argument of plain-
tiffs in error in their effort to show that these words make
the meaning of the act uncertain and repugnant. It must
be clear to anyone examining this statute, that the General
Assembly could not enumerate all the unlawful means that
might be conceived for overthrowing a government, and so
it used the general terms used in this act to make punish-
able the advocacy of the overthrow of the existing govern-
ment. It is clear that it intended to embrace and that it
did embrace all and every kind of unlawful means for over-
throwing this government that might be devised by the ene-
mies of the government. The constitutions clearly provide
the lawful means by which the existing form of govern-
ment may be reformed or changed, and any means other
than those provided are unlawful. Plaintiffs in error seem
to argue that the language of the act must be such that the
term "violence and other unlawful means" is limited to such
unlawful acts as create a clear, real and imminent danger

to the form of government now secured to this State, but this is not the true law. Of course, if the acts are too trivial for the law's notice and create no apparent danger and no perturbation in the peaceful order of things, then no crime is committed; but if the means advocated are apparently adapted to the end, then the public peace, so far as advocacy is concerned, is as much disturbed as if they should be so actually. (1 Wharton on Crim. Law,—11th ed.— secs. 221-225; 1 Bishop's New Crim. Law, secs. 737-740.) Manifestly, the legislature has authority to forbid the advocacy of a doctrine designed and intended to overthrow the government without waiting until there is a present and imminent danger of the success of the plan advocated. If the State were compelled to wait until the apprehended danger became certain, then its right to protect itself would come into being simultaneously with the overthrow of the government, when there would be neither prosecuting officers nor courts for the enforcement of the law. The act under consideration makes the advocacy of the overthrow of the government a felony, and provides for the punishment of the advocate, and so it is not necessary that there be a real or actual effort to carry out the program that he advocates. The act is certain in its terms, has no double meaning and will not in any way deceive the common mind.

Plaintiffs in error further contend that because of uncertainties and ambiguities appearing in the statute, they are deprived of the right to be informed of the nature and cause of the accusation against them, and that the act is therefore repugnant to section 9 of article 2 of the State constitution, and that they are deprived of their liberty and property without due process of law, thereby making the act repugnant to section 2 of article 2 of the State constitution and the fourteenth amendment to the constitution of the United States. We have already said that there are no substantial uncertainties or ambiguities in the language of the act and that the words used in it, taken in their ordi-

nary sense, clearly express the legislative intent. There is no organic law or rule of sound public policy that requires the legislature to define the meanings of English words in common and daily use. (*State* v. *Quinlan,* 86 N. J. L. 120, 91 Atl. 111.) Law in its regular course of administration through courts of justice is due process, and when secured by the law of the State, the constitutional requisition is satisfied. Due process of law is so secured by laws operating on all alike and not subjecting the individual to the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice. (*Caldwell* v. *State,* 137 U. S. 692, 11 Sup. Ct. 224; *Burdick* v. *People,* 149 Ill. 600.) These objections to the validity of the statute are without merit. See *State* v. *Moilen,* (Minn.) 167 N. W. 345, 1 A. L. R. 331, and note.

The objection that the penalties are disproportioned to the nature of the offense is overruled. When one considers the blessings of the form of government now secured to this State and nation, it is difficult to think of a punishment disproportionate to the offense of advocating the overthrow of our government by force and violence. The nature, character and extent of penalties are a matter almost wholly legislative. The General Assembly may prescribe definite terms of imprisonment, a specified amount as a fine, or fix the maximum or minimum limits of either, which the courts are bound to respect and follow. The courts have jurisdiction to interfere with legislation upon this subject only where there has been a great departure from the fundamental law and the spirit and purpose thereof, and a penalty imposed which is manifestly in excess of the constitutional limitations. *State* v. *Moilen, supra; State* v. *Hennessy, supra; People* v. *Illinois State Reformatory,* 148 Ill. 413.

The act is entitled, "An act to amend an act entitled 'An act to revise the law in relation to criminal jurispru-

dence,' " and it is contended that the act is void for the reason that it contravenes section 13 of article 4 of the constitution in that the subject of the act is not expressed in the title.    Plaintiffs in error concede that we have sustained many amendments to the Criminal Code which have similar titles, but they argue that those acts are not similar to the act in question for the reason that the present act creates crimes unknown to the jurisprudence of Illinois.    It is further argued that section 263 of the Criminal Code, which has been part of the law of this State for more than seventy-five years, expressly declares that treason and misprision of treason are the only crimes against the government and the people of this State, and that since the act under consideration creates new crimes by enlarging the scope of this section, by adding thereto six new sub-sections, the title should have indicated this radical departure from the long-established policy of the State.    We have held that the title of the Criminal Code is not liable to any constitutional objection by reason of its generality.    (*Fuller* v. *People,* 92 Ill. 182.)    The provision of the constitution under consideration has been uniformly construed liberally in favor of the validity of enactments.    If, by any fair intendment, the provisions in the body of the act have a necessary and proper connection with the title, it is not objectionable.    To render a provision in the body of an act void, as not embraced in the title, such provision must be incongruous with the title or must have no proper connection or relation with the title.    *People* v. *Clark,* 296 Ill. 46.

The last assault made upon the constitutionality of the act is that it is repugnant to section 4 of article 2 of the constitution of Illinois, which provides that "every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty," on the ground that the act does not define what shall constitute an abuse of the right of free speech.    It would be a strange constitution, indeed, that would guarantee to any man the right to advo-

cate the destruction by force of that which that constitution guarantees to the people living under its protection. The true limitations of the constitutional guaranty of freedom of speech and press, so far as the question is here involved, were clearly stated in *Schenck* v. *United States,* 249 U. S. 47, 39 Sup. Ct. 247. In a unanimous opinion the Supreme Court of the United States said: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." Speaking in a later case of the Espionage act, the Supreme Court of the United States said: "Simple as the law is, perilous to the country as disobedience to it was, offenders developed, and when it was exerted against them challenged it to decision as a violation of the right of free speech assured by the constitution of the United States. A curious spectacle was presented. That great ordinance of government and orderly liberty was invoked to justify the activities of anarchy or of the enemies of the United States, and by a strange perversion of its precepts it was adduced against itself." (*Schaefer* v. *United States,* 251 U. S. 466, 40 Sup. Ct. 259.) "It is settled that the State may prohibit publications or teachings which are injurious to society, or which tend to subvert or imperil the government or to impede or hinder it in the performance of its public and governmental duties, without infringing the constitutional provisions which preserve freedom of speech and of the press. These constitutional provisions preserve the right to speak and to publish, without previously submitting for official approval the matter to be spoken or published, but do not grant immunity to those who abuse this privilege, nor prevent the State from making it a penal offense to publish or advocate matters or measures inimical to the public welfare." (*State* v. *Holm, supra.*) Speaking of a similar provision of the constitution, the Court of Appeals of New

York said: "It places no restraint upon the power of the legislature to punish the publication of matter which is injurious to society according to the standard of the common law. It does not deprive the State of the primary right of self-preservation. It does not sanction unbridled license nor authorize the publication of articles prompting the commission of murder or the overthrow of government by force. All courts and commentators contrast the liberty of the press with its licentiousness, and condemn as not sanctioned by the constitution of any State appeals designed to destroy the reputation of the citizen, the peace of society, or the existence of the government." (*People* v. *Most,* 171 N. Y. 423, 64 N. E. 175.) Discussing a similar contention, the Supreme Court of New Jersey said: "The fundamental answer to the point raised is, that free speech does not mean unbridled license of speech, and that language tending to the violation of the rights of personal security and private property and toward breaches of the public peace is an abuse of the right of free speech for which, by the very constitutional language invoked, the utterer is responsible." *State* v. *Boyd,* 86 N. J. L. 75, 91 Atl. 586.

Our investigation is limited to the right of the General Assembly to enact this law. Granting that there is much force to the argument of counsel for plaintiffs in error that repressive measures of this character are unwise, that they tend to solidify the several disintegrated groups of malcontents, that they drive the agitators to cellars where they plot overt acts and become a real menace, and that the enactment of such measures is a confession that the theory of popular self-government is wrong because the people cannot be trusted to protect themselves against false doctrines, the arguments are not properly directed to the judicial branch of the government. It may be that this evil can best be met by providing a place where all agitators can relieve themselves of their pent-up fury and where all preachers of false doctrines can work off their fervor

from a soapbox in the open air, but that is a question which our constitution has committed for decision to the legislative branch of the government. The wisdom or propriety of such legislation is not a question for the courts. We repeat, the courts are concerned only with the question of the legislative power to enact it, (*State* v. *Moilen, supra; People* v. *Graham,* 301 Ill. 446;) and of that we have no doubt.

The indictment is in twelve counts, the odd-numbered counts severally charging a conspiracy to commit the acts which are declared to be crimes by the several sections of the statute hereinbefore quoted, and the even-numbered counts severally concluding as at common law and each charging a conspiracy to do unlawful acts, which consist of the same elements as the crimes set forth as the purpose of the conspiracy in the next preceding odd-numbered count. The first and second counts each charge that plaintiffs in error and others, on the second day of September, 1919, "in said county of Cook in the State of Illinois, aforesaid, did unlawfully, knowingly, wickedly, maliciously and feloniously combine, conspire, confederate and agree together and with divers other persons, whose names to the grand jurors are unknown, with the fraudulent and malicious intent, wrongfully and wickedly to unlawfully and openly advocate by word of mouth and by writing the reformation and overthrow by violence and by other unlawful means, the exact character of which is to the grand jurors unknown, the representative form of government now secured to the citizens of the United States of America and to the State of Illinois by the constitution of the United States of America and the constitution of the State of Illinois, and to unlawfully, wickedly and feloniously publish, issue and knowingly sell and distribute books, papers and documents and other written and printed matter which advocate crime and violence as a means of accomplishing the reformation and overthrow of the constitutional represen-

tative form of government secured to the citizens of the United States of America and of the State of Illinois, and to unlawfully and feloniously and wickedly organize and aid in the organization of a certain society and association, to-wit, communist labor party of the United States of America, and to become members of such society and association, the object of which is and was to be to advocate the reformation and overthrow of the existing form of government of the United States of America and of the State of Illinois by violence and other unlawful means, the exact description of which is to the grand jurors unknown, and to knowingly and unlawfully and voluntarily be present at meetings and assemblies at which the reformation and overthrow of the existing form of government of the United States of America and of the State of Illinois was to be advocated by crime and by violence, and to knowingly and unlawfully display and to exhibit at meetings and gatherings and parades in public or in private flags, banners, emblems and other insignia, the exact description of which to the grand jurors is unknown, symbolizing and intending to symbolize a purpose to overthrow by force and by violence and by physical injury to persons and property the representative form of government now secured to the citizens of the United States of America and to the State of Illinois and the several States of the Union by the constitution of the United States of America and the constitution of the State of Illinois." Counts 3 and 4 charge a conspiracy to commit the felony and unlawful act described in section 265*f* of the statute; counts 5 and 6, the crime and unlawful act described in section 265*d;* counts 7 and 8, the felony and unlawful act described in section 265*c;* counts 9 and 10, the felony and unlawful act described in section 265*b;* and counts 11 and 12, the felony and unlawful act described in section 265*a* of the statute. A *nolle prosequi* was entered as to count 5.

Plaintiffs in error contend that the indictment is insufficient, and that the trial court erred in denying each of the motions to quash the indictment, and the motion in arrest of judgment, and in overruling the objection to the reception of any evidence in support of the indictment. Substantially all of the objections urged against the validity of the statute are urged against the sufficiency of the indictment, and each and every count thereof. The contentions that the representative form of government mentioned in the several counts of the indictment is not clearly named and identified, that the representative form of government of the several States is for the benefit of the citizens of the respective States and not for the benefit of the respective States, that the form of government existing at the time the indictment was returned is not declared by the grand jury to be the same form of government existing at the time plaintiffs in error conspired to advocate its overthrow, or at the time the act became a law, and that there is uncertainty, ambiguity and repugnancy in the indictment and each and every count thereof because of the use of the uncertain, ambiguous and repugnant words and phrases of the statute, have all been fully answered in former paragraphs of this opinion and will not be further considered here. The argument, that the county and State wherein it was charged that plaintiffs in error conspired to advocate the reformation and overthrow of government is not shown by the allegations of the indictment, is clearly without merit.

The only point urged against the indictment that has not been considered and overruled in preceding paragraphs of this opinion is the argument that the indictment is bad for want of an allegation showing that the advocacy mentioned therein was to be carried on and prosecuted to, before and among persons who should and would owe permanent or temporary allegiance to the sovereignty or to the several sovereignties, against whose form of government said advocacy was to be directed. We are unable to see

how it can be seriously urged that if said advocacy is carried on and prosecuted before persons who do not owe allegiance to this State or nation, the advocacy would be entirely harmless and could not by any possibility create or even threaten a real danger to the constitutional form of government now existing and secured to the several States of the nation. It would be a pitiful situation, indeed, if this nation or State could not protect itself against a group of undesirable aliens who were organizing for the purpose of destroying our established government. And wouldn't Illinois be an object of pity and contempt if she could not prevent her own citizens from advocating to this group of foreigners the forcible reformation and overthrow of our State government! This indictment does not charge plaintiffs in error with treason, and the fact that some or most of the men with whom plaintiffs in error conspired and consorted could not be punished as traitors, if they undertook to carry out the program advocated by plaintiffs in error, does not affect the sufficiency of this indictment. (*Frohwerk* v. *United States,* 249 U. S. 204, 39 Sup. Ct. 249.) Plaintiffs in error are charged with conspiracy and the conspiracy is complete when the agreement to do the thing forbidden by law has been made. The conspiracy is none the less punishable because it is not successful. The essence of the offense is not the accomplishment of the unlawful object, but it is the unlawful combination or agreement to accomplish the criminal or unlawful purpose. *People* v. *Smith,* 239 Ill. 91; *People* v. *Blumenberg,* 271 id. 180.

Some of the language used in this indictment and in the statute on which it is based may not be grammatically exact, but such exactness is not required. (*People* v. *Blumenberg, supra.*) We have held that the statute clearly defines the offense, and where that is true and the indictment charges the offense substantially in the language of the statute, the indictment is sufficient. To hold that the indictment does not state a public offense would be to say that

the statute defines none. The language of the statute and of the indictment being substantially the same, the latter must be understood in the same sense as the former. (*People* v. *Malley,* (Cal.) 194 Pac. 48.) The offense with which plaintiffs in error are charged is stated plainly enough to be readily understood by the jury, and plaintiffs in error were sufficiently informed to properly prepare their defense. This is all the law requires. (*People* v. *Robertson,* 284 Ill. 620; *People* v. *Krause,* 291 id. 64; *State* v. *Hennessy, supra.*) In an indictment for a conspiracy to commit a felony it is only necessary to designate the felony intended to be committed by such description as will apprise the defendants of the exact charge upon which they will be tried, and it is not required that the felony be described with the same accuracy as would be required in an indictment for the felony itself. (*People* v. *Warfield,* 261 Ill. 293.) Since it has always been unlawful to advocate the overthrow by force of established government, the common law counts in this indictment are good. (*People* v. *Blumenberg, supra; Smith* v. *People,* 25 Ill. 9.) We have examined each and every count of the indictment and the objections of plaintiffs in error thereto, and find the indictment sufficient. We shall not discuss objections urged to specific counts of the indictment for the reason that the verdict in this case was a general verdict, and the rule is established by many decisions of this court, that one good count in an indictment will support such a verdict, (*People* v. *Darr,* 262 Ill. 202; *Ochs* v. *People,* 124 id. 399;) and no good purpose could be served by lengthening this opinion for the purpose of discussing these objections.

Plaintiffs in error filed a petition for a bill of particulars, in which they requested the court to require the State's attorney to furnish them with a copy of all books, papers, documents, and written and printed matter which the State's attorney intended to introduce in evidence upon the trial. This petition was granted and the information furnished.

They also requested that the State's attorney inform them of the nature and particulars of the "violence," "other unlawful means," "force," "crime" and "physical injury," and that he provide them with a particular description of the kind and nature of the "flags, banners, emblems and other insignia" mentioned in the indictment. This latter request the court denied. The bill of particulars furnished plaintiffs in error covers eight pages of the printed abstract. It gives them the title and description of every book, pamphlet, leaflet, newspaper, letter, hand-bill and song, and the minutes of the various conventions and committees in which plaintiffs in error participated, and the platform of the various parties and organizations to which they belonged. Plaintiffs in error were not charged with doing any particular acts of "violence" or with using any "force" or "other unlawful means," so it was not possible to particularize the "violence," etc., advocated by them. The terms are common everyday terms with well known and established meanings, and there was no necessity for details concerning them. Whether the State shall be required to furnish a bill of particulars in a particular case, and the character and extent of such a bill, if required, rests in the sound legal discretion of the trial court, and it is only in cases where it is clear that there has been an abuse of this discretion that the action of the trial court, in denying a part or all of the request, will be held to be error. (*People* v. *Munday,* 280 Ill. 32; *People* v. *Nall,* 242 id. 284.) There was no abuse of discretion in the court's action in this regard. Plaintiffs in error were sufficiently and fully advised of the charge against them.

August 31, 1919, the socialist national convention convened in Chicago. The radical element, who styled themselves the "Left Wingers," undertook to capture the socialist party and to commit it to a revolutionary program. They created such a disturbance that the conservative element, with the assistance of the Chicago police, threw them

out of Machinists' Hall, where the convention was being held. The following day, the Left Wingers gathered in an ante-room in the same building and elected plaintiff in error Owens as temporary chairman of their group. About forty or fifty persons attended the first session, among them plaintiffs in error Owens, Lloyd, Carney, England, Katterfeld, Lore, Sandberg, Brown, Christensen, Shipman, Ash, Hankin, Vogel, Kjar, Stolar and Krumbein. They were in session for five days. The number of delegates increased during the session to about seventy-five. A different person was elected chairman of the convention each day. Lloyd was elected sergeant-at-arms and acted in that capacity throughout the convention. Benjamin Gitlow, a prominent radical of New York and business manager of *The Revolutionary Age,* the official newspaper of the Left Wingers, was a delegate to this convention and took an active part in all the proceedings. Thereafter, he was indicted and convicted in New York of criminal anarchy. (*People* v. *Gitlow,* 187 N. Y. Supp. 783; affd. 234 N. Y. 132.) On the first day they adopted the bolshevik yell, which ran like this:

"Bolshevik, bolshevik, bolshevik, bang!
We are members of the 'Gene Debs gang.
Are we rebels? I should smile.
We are with the soviets all the while."

—and thereafter each session of the convention was opened with this yell. After the convention had been permanently organized, committees were appointed. With other delegates, plaintiffs in error England and Carney were named as members of the committee on credentials; Lore, Lloyd and Christensen on international relations; Owens on constitution; Carney and England on program and labor; Lore, Sandberg and Brown on platform; Katterfeld on organization, education and propaganda; Owens on ways and means; and Lore and Carney on socialist press and publicity. Plaintiffs in error accepted these assignments and served on the committees. The delegates to this convention were constantly informed of the activities of the

previous day by having placed in their hands at each suc-
ceeding session a mimeographed copy of the minutes of
the preceding session./ All committee reports were mimeo-
graphed and distributed among the delegates.  Sessions of
the second day were held in the billiard room in the same
building.  At this session the name and emblem of the or-
ganization were adopted.  The committee on resolutions
recommended the name, "The Communist Labor Party of
the United States of America," and considerable debate
took place regarding the word "communist."  During the
debate, plaintiff in error Carney said that the socialists had
disgraced themselves and that a new name must be selected;
that the word "communism" meant a revolutionary move-
ment which embodied and embraced the Third International.
After this explanation the name was adopted.  The com-
mittee also recommended that the convention adopt as an
emblem, the one used by the soviet government of Russia.
That emblem is circular in form, has on it a hammer and
sickle, and bears the inscription, "Workers of the World
Unite."  This emblem was adopted.  At this session the
platform committee was instructed to prepare and submit
a platform containing a clear, terse and revolutionary state-
ment of their principles, and nothing more.  The delegates
to this communist convention had been sent by their locals
as delegates to the socialist convention, and after they had
been refused seats in the latter some of them became con-
cerned about their per diem.  The ways and means com-
mittee recommended that communist mass meetings be held
in different places in the city of Chicago for the purpose
of raising funds.  The recommendation was adopted and
two meetings were held, one at Old Style Inn, and one at
the West Side Auditorium.  The quarters where the ses-
sions of the first two days were held were small and unsat-
isfactory, and a committee selected to secure larger quarters
reported that arrangements had been made to hold the ses-
sions at the I. W. W. hall at 119 Throop street, Chicago.

The meetings of Wednesday, Thursday and Friday, September 3, 4 and 5, 1919, were held in this hall. At the first session in this hall, the delegates began singing revolutionary songs. They sang "The Red Flag" and "The Internationale" and gave the bolshevik yell. The usual committee reports were received and adopted. The platform committee reported a platform, which was read and acted upon, sentence by sentence, and paragraph by paragraph; that is, each sentence in a paragraph was read and acted upon separately, and then the entire paragraph was read and acted upon. Each delegate was furnished with, and held in his hands during the reading, a mimeographed copy of the committee report. At the evening session of September 3, the program and labor committee made its report, and it was considered in the same manner in which the platform committee's report was considered. These two reports occupied the attention of the convention throughout the afternoon and evening of September 3 and the forenoon of September 4. At the afternoon session of September 4, both reports were unanimously adopted. Practically every delegate in the convention took part in the discussion and debate of these committee reports. After this, the committee on international relations recommended that the convention pledge itself to affiliate with the revolutionary working classes throughout the world that are affiliated with the Third International; that the delegates pledge themselves to work in accordance with the program outlined and adopted by the congress of the Third International at Moscow, Russia; and that the national executive committee of the party be instructed to take immediate steps to affiliate with the Third International. This resolution was unanimously adopted. The constitution committee reported, and the constitution was adopted. Owens, England, Carney and Katterfeld were named as members of the national executive committee. The business of the convention was concluded, and the convention adjourned *sine die* at 11 P. M.

Friday, September 5, 1919. Immediately before the final adjournment, the delegates had a musical program of revolutionary songs.

We state the object and purposes of the communist labor party by quoting from their platform and program:

"The communist labor party of the United States of America declares itself in full harmony with the revolutionary working class parties of all countries and stands by the principles stated by the Third International formed at Moscow.

"With them it thoroughly appreciates the complete development of capitalism into its present form of capitalist imperialism with its dictatorship of the capitalist class and its absolute suppression of the working class.

"With them it also fully realizes the crying need for an immediate change in the social system; it realizes that the time for parleying and compromise has passed; and that now it is only the question whether all power remains in the hands of the capitalist or is taken by the working class.

"The communist labor party proposes the organization of the workers as a class, the overthrow of capitalist rule and the conquest of political power by the workers. The workers organized as the ruling class, shall, through their government make and enforce the laws; they shall own and control land, factories, mills, mines, transportation systems and financial institutions. All power to the workers!

"The communist labor party has as its ultimate aim: The abolition of the present system of production, in which the working class is mercilessly exploited, and the creation of an industrial republic wherein the machinery of production shall be socialized so as to guarantee to the workers the full social value of the product of their toil.

"To this end we ask the workers to unite with the communist labor party for the conquest of political power to establish a government adapted to the communist transformation.

"The communist labor party of America declares itself in complete accord with the principles of communism, as laid down in the manifesto of the Third International formed at Moscow.

"In essence, these principles are as follows:

"1. The present is the period of the dissolution and collapse of the whole system of world capitalism. Unless capitalism is replaced by the rule of the working class, world civilization will collapse.

"2. The working class must organize and train itself for the capture of State power. This capture means the establishment of the new working class government machinery, in place of the State machinery of the capitalists.

"3. This new working class government—the dictatorship of the proletariat—will re-organize society on the basis of communism, and accomplish the transition from capitalism to the communist commonwealth.

"Communist society is not like the present fraudulent capitalist democracy—which, with all its pretensions to equality, is merely a disguise for the rule of the financial oligarchy—but it is a proletarian democracy, based on the control of industry and the State by the workers, who are thereby free to work out their own destiny. It does not mean capitalist institutions of government, which are controlled by the great financial and industrial interests, but organs of administration created and controlled by the masses themselves; as, for example, the soviets of Russia.

"4. The dictatorship of the proletariat shall transfer private property in the means of production and distribution to the working class government, to be administered by the workers themselves. It shall nationalize the great trusts and financial institutions. It shall abolish capitalist agricultural production.

"5. The present world situation demands that the revolutionary working class movements of all countries shall closely unite.

"6. The most important means of capturing State power for the workers is the action of the masses, proceeding from the place where the workers are gathered together— in the shops and factories. The use of the political machinery of the capitalist State for this purpose is only secondary.

"7. In those countries in which there is a possibility for the workers to use this machinery in the class struggle, they have, in the past, made effective use of it as a means of propaganda, and of defense. In all countries where the conditions for a working class revolution are not ripe, the same process must go on.

"8. We must rally all groups and proletarian organizations which have manifested and developed tendencies leading in the direction above indicated, and support and encourage the working class in every phase of its struggle against capitalism.   *   *   *

"The economic conditions in every country determine the form of organization and method of propaganda to be adopted. In order efficiently to organize our movement here, we must clearly understand the political and economic structure of the United States.

"Although the United States is called a political democracy there is no opportunity whatever for the working class through the regular political machinery to effectively oppose the will of the capitalist class.

"The years of socialist activity on the political field have brought no increase of power to the workers. Even the million votes piled up by the socialist party in 1912, left the party without any proportionate representation. The Supreme Court, which is the only body in any government in the world with the power to review legislation passed by the popular representative assembly, would be able to obstruct the will of the working class even if Congress registered it, which it does not. The constitution, framed by the capitalist class for the benefit of the capitalist class, can

not be amended in the workers' interest, no matter how large a majority may desire it.  *  *  *

"Not one of the great teachers of scientific socialism has ever said that it is possible to achieve the social revolution by the ballot.

"However, we do not ignore the value of voting, or of electing candidates to public office—so long as these are of assistance to the workers in their economic struggle.  Political campaigns, and the election of public officials, provide opportunities for showing up capitalist democracy, educating the workers to a realization of their class position, and of demonstrating the necessity for the overthrow of the capitalist system.  But it must be clearly emphasized that the chance of winning even advanced reforms of the present capitalist system at the polls is extremely remote; and even if it were possible, these reforms would not weaken the capitalist system.  *  *  *

*Program.*

"1. We favor international alliance of the communist labor party only with the communist groups of other countries,—those which have affiliated with the communist international.

"2. We are opposed to association with other groups not committed to the revolutionary class struggle.

"3. We maintain that the class struggle is essentially a political struggle,—that is, a struggle by the proletariat to conquer the capitalist State, whether its form be monarchical or democratic-republican, and to replace it by a governmental structure adapted to the communist transformation.

"4. Communist platforms, being based on the class struggle, and recognizing that this is the historical period of the social revolution, can contain only one demand: The establishment of the dictatorship of the proletariat.

"5. We favor organized party activity and co-operation with class-conscious industrial unions, in order to unify industrial and political class-conscious propaganda and action.

Locals and branches shall organize shop branches, to conduct the communist propaganda and organization in the shops and to encourage the workers to organize in one big union.

"6. The party shall propagandize industrial unionism and industrial union organization, pointing out their revolutionary nature and possibilities.

"7. The party shall make the great industrial battles its major campaigns, to show the value of the strike as a political weapon.

"8. The party shall maintain strict control over all members elected to public office—not only the local organizations, but the national executive committee. All public officials who refuse to accept the decisions of the party shall be immediately expelled.

"9. In order that the party shall be a centralized organization, capable of united action, no autonomous groups or federations independent of the will of the entire party shall be permitted.

"10. All party papers and publications indorsed by the party; and all educational and propaganda institutions indorsed by the party, shall be owned and controlled by the regular party organization.

"11. Party platforms, propaganda, dues and methods of organization shall be standardized.

*Special Report on Labor Organization.*

"The purpose of the party is to create a unified revolutionary working class movement in America. * * *

"By the term 'revolutionary industrial unionism' is meant the organization of the workers into unions by industries with a revolutionary aim and purpose; that is to say, a purpose not merely to defend or strengthen the status of the workers as wage earners, but to gain control of industry.

"In any mention of revolutionary industrial unionism in this country, there must be recognized the immense effect upon the American labor movement of the propaganda and example of the Industrial Workers of the World, whose long and valiant struggles and heroic sacrifices in the class-war have earned the respect and affection of all workers everywhere. We greet the revolutionary industrial proletariat of America, and pledge them our wholehearted support and co-operation in their struggles against the capitalist class. Elsewhere in the organized labor movement a new tendency has recently manifested itself, as illustrated by the Seattle and Winnipeg strikes, the One Big Union and Shop Committee movements in Canada and the West, and the numerous strikes all over the country of the rank and file, which are proceeding without the authority of the old reactionary trade union officials, and even against their orders. This tendency, an impulse of the workers toward unity for common action across the lines of craft-divisions, if carried to its logical conclusion would inevitably lead to workers' control of industry.

"This revolt of the rank and file must not be allowed to end in the disorganization of the ranks of organized labor. We must help to keep the workers together, and through rank and file control of the unions, assist the process of uniting all workers in one big union.

"With this purpose in view, the communist labor party welcomes and supports, in whatever labor organization found, any tendency toward revolutionary industrial unionism. We urge all our members to join industrial unions. Where the job-control of the reactionary craft-unions compels them to become members of these craft-unions, they shall also join an industrial organization, if one exists. In districts where there are no industrial unions, our members shall take steps to organize one.

"To labor and labor alone is industry responsible. Without the power of labor, industry could not function. The

need of the hour is that labor recognize the necessity of organization and education. This cannot be achieved by attempting to influence the leaders of the labor movement, as has been clearly shown by the actions of the recent convention of the American Federation of Labor. It can only be done by getting the workers on the job to come together and discuss the vital problems of industry. * * *

"We suggest that some plan of labor organization be inaugurated along the lines of the Shop Steward and Shop Committee movements. These committees can serve as a spur or check upon the officials of the unions; they will necessarily reflect the spirit and wishes of the rank and file, and will educate the workers on the job in preparation for the taking over of industry."

The organization of the communist labor party in Chicago was the outgrowth of the socialist Left Wing conference held in New York City June 21-24, 1919. Lloyd, Carney and England were delegates to this conference. Lloyd was elected chairman, and July 17, 1919, sent his check for $650 as a contribution to help defray the expenses of this meeting. Between seventy-five and eighty delegates attended. The conference elected a national executive council consisting of nine members, none plaintiffs in error here. This Left Wing conference adopted a program of activities and named *The Revolutionary Age* as the official newspaper of the Left Wingers. They adopted a resolution, urging all revolutionary socialists to send delegates to the socialist convention at Chicago, and to be prepared to form a new party if the national executive committee of the socialist party did not re-instate all suspended and expelled members. The national executive committee was instructed to draft and cause to be printed the "Left Wing Manifesto." Benjamin Gitlow, a prominent delegate to this conference and a member of the national executive council, caused to be published in *The Revolutionary Age,* dated July 5, 1919, this manifesto. Sixteen thousand copies of this issue were

printed.  We re-produce the title page of this issue of *The Revolutionary Age,* which publication was received in evidence as State's exhibit 38.

## The Revolutionary Age

Devoted to the International Communist Struggle

| Vol. 2, No. 1. | Saturday, July 5, 1919 | Price 5c. |
| --- | --- | --- |

*In This Issue:*
*Left Wing Convention,*
*Manifesto and Program*

### "Nothing Doing!"

The Left Wing manifesto covers twenty-five pages of the printed abstract.  It reviews the rise of socialism, condemns the socialist party and moderate socialism for confining its advocacy of the reformation of government to constitutional amendments brought about by the exercise of the elective franchise, and declares that method wholly inadequate to accomplish the purposes of the Left Wing, and asserts that the reformation can be brought about only by a revolution of the proletariat, a term used in modern jargon to designate all the unpropertied people in a modern State.  It condemns the American Federation of Labor for its support of the government.  We quote from the manifesto:

"The world is in crisis. Capitalism, the prevailing system of society, is in process of disintegration and collapse. Out of its vitals is developing a new social order, the system of communist socialism; and the struggle between this new social order and the old is now the fundamental problem of international politics.     *   *   *

"But socialism itself is in crisis. Events are revolutionizing capitalism and socialism—an indication that this is the historic epoch of the proletarian revolution.     *   *   *
Capitalism cannot reform itself; it cannot be reformed. Humanity can be saved from its last excesses only by the communist revolution. There can now be only the socialism which is one in temper and purpose with the proletarian revolutionary struggle. There can be only the socialism which unites the proletariat of the whole world in the general struggle against the desperately destructive imperialisms—the imperialisms which array themselves as a single force against the onsweeping proletarian revolution.     *   *   *

"The class struggle is the heart of socialism. Without strict conformity to the class struggle, in its revolutionary implications, socialism becomes either sheer Utopianism, or a method of re-action.     *   *   *

"The socialism which developed as an organized movement after the collapse of the revolutionary First International was moderate, petty bourgeois socialism.     *   *   *

"This moderate socialism initiated the era of 'constructive' social reforms. It accepted the bourgeois State as the basis of its activity and *strengthened* that State. Its goal became 'constructive reforms' and cabinet portfolios—the 'co-operation of classes,' the policy of openly or tacitly declaring that the coming of socialism was the concern 'of all the classes,' instead of emphasizing the Marxian policy that the construction of the socialist system is the task of the revolutionary proletariat alone. In accepting social-reformism, the 'co-operation of classes,' and the bourgeois parliamentary State as the basis of its action, moderate so-

cialism was prepared to share responsibility with the bourgeoisie in the control of the capitalist State, even to the extent of defending the bourgeoisie against the working class and its revolutionary mass movement. * * *

"Evading the actual problems of the revolutionary struggle, the dominant socialism of the Second International developed into a peaceful movement of organization, of trades union struggles, of co-operation with the middle class, of legislation and bourgeois State capitalism as means of introducing socialism. * * *

"This development meant, obviously, the abandonment of fundamental socialism. It meant working on the basis of the bourgeois parliamentary State, instead of the struggle to destroy that State; it meant the 'co-operation of classes' for State capitalism, instead of the uncompromising proletarian struggle for socialism. Government ownership, the objective of the middle class, was the policy of moderate socialism. Instead of the revolutionary theory of the necessity of conquering capitalism, the official theory and practice was now that of *modifying* capitalism, of a gradual peaceful 'growing into' socialism by means of legislative reforms. * * *

"When the economic and political crisis *did* develop potential revolutionary action in the proletariat, the dominant socialism immediately assumed an attitude *against* the revolution. The proletariat was urged *not* to make a revolution. The dominant socialism united with the capitalist governments to prevent a revolution.

"The Russian revolution was the first act of the proletariat against the war and imperialism. But while the masses made the revolution in Russia, the bourgeoisie usurped power and organized the regulation bourgeois parliamentary republic. This was the first stage of the revolution. Against this bourgeois republic organized the forces of the proletarian revolution. Moderate socialism in Russia, represented by the mensheviki and the social revo-

lutionists, acted against the proletarian revolution. It united with the Cadets, the party of bourgeois imperialism, in a coalition government of bourgeois democracy. It placed its faith in the war 'against German militarism,' in national ideals, in parliamentary democracy and the 'co-operation of classes.'

"But the proletariat, urging on the poorer peasantry, conquered power. It accomplished a proletarian revolution by means of the bolshevik policy of 'all power to the soviets,'—organizing the new transitional State of proletarian dictatorship. Moderate socialism, even after its theory that a proletarian revolution was impossible had been shattered by life itself, acted against the proletarian revolution and mobilized the counter-revolutionary forces against the soviet republic,—assisted by the moderate socialism of Germany and the allies. * * *

"There is, accordingly, a common policy that characterizes moderate socialism, and that is *its conception of the State.* * * *

"Revolutionary socialism, on the contrary, insists that the democratic parliamentary State can never be the basis for the introduction of socialism; that it is necessary to *destroy* the *parliamentary State,* and construct a new State of the organized producers, which will deprive the bourgeoisie of political power, and function as a revolutionary dictatorship of the proletariat.

"The proletarian revolution in action has conclusively proven that moderate socialism is incapable of realizing the objectives of socialism. Revolutionary socialism alone is capable of mobilizing the proletariat for socialism, for the conquest of the power of the State, by means of revolutionary mass action and proletarian dictatorship.

### American Socialism.

"The up-surge of revolutionary socialism in the American socialist party, expressed in the Left Wing, is not a

product simply of European conditions. It is, in a fundamental sense, the product of the experience of the American movement—the Left Wing tendency in the party having been invigorated by the experience of the proletarian revolutions in Europe. * * *

"While the concentration of industry and social developments generally conservatized the skilled workers, it developed the typical proletariat of unskilled labor, massed in the basic industries. This proletariat, expropriated of all property, denied access to the A. F. of L. unions, required a labor movement of its own. This impulse produced the concept of industrial unionism, and the I. W. W. But the dominant moderate socialism rejected industrial unionism and openly or covertly acted against the I. W. W.

"Revolutionary industrial unionism, moreover, was a recognition of the fact that extra-parliamentary action was necessary to accomplish the revolution, that *the political State should be destroyed* and a new proletarian State of the organized producers constructed in order to realize socialism. But the socialist party * * * stultified working class political action, by limiting political action to elections and participation in legislative reform activity. * * *

"Its representatives were petty bourgeois, moderate, hesitant, oblivious of the class struggle in its fundamental political and industrial implications. * *. *

"The war and the proletarian revolution in Russia provided the opportunity. The socialist party, under the impulse of its membership, adopted a militant declaration against the war. But the officials of the party sabotaged this declaration. * * *

"This policy necessarily developed into a repudiation of the revolutionary socialist position. When events developed the test of accepting or rejecting the revolutionary implications of the declaration against the war, the party bureaucracy immediately exposed its reactionary policy, by repudiating the policy of the Russian and German communists,

and refusing affiliation with the communist international of revolutionary socialism.  * * *

"Strikes are developing which verge on revolutionary action, and in which the suggestion of proletarian dictatorship is apparent, the striker-workers trying to usurp functions of municipal government, as in Seattle and Winnipeg. The mass struggle of the proletariat is coming into being.

"A minor phase of the awakening of labor is the trades unions organizing a labor party; in an effort to conserve what they have secured as a privileged caste.  A labor party is not the instrument for the emancipation of the working class; its policy would in general be what is now the official policy of the socialist party—reforming capitalism on the basis of the bourgeois parliamentary State.  Laborism is as much a danger to the revolutionary proletariat as moderate, petty bourgeois socialism,—the two being expressions of an identical tendency and policy.  There can be no compromise either with laborism or the dominant moderate socialism.

"But there is a more vital tendency,—the tendency of the workers to initiate mass strikes—strikes which are equally a revolt against the bureaucracy in the unions and against the employers.  These strikes will constitute the determining feature of proletarian action in the days to come. Revolutionary socialism must use these mass industrial revolts to broaden the strike, to make it general and militant; use the strike for political objectives, and, finally, develop the mass political strike against capitalism and the State.  * * *

"Our task is to encourage the militant mass movements in the A. F. of L. to split the old unions, to break the power of unions which are corrupted by imperialism and betray the militant proletariat.  The A. F. of L. in its dominant expression, is united with imperialism.  A bulwark of reaction,—it must be exposed and its power of evil broken.

### Political Action.

"The class struggle is a political struggle.  It is a political struggle in the sense that its objective is political—the

*overthrow of the political organization* upon which capitalistic exploitation depends, and the introduction of a new social system. The direct objective is the conquest by the proletariat of the power of the State.

*"Revolutionary socialism does not propose to 'capture' the bourgeois parliamentary State, but to conquer and destroy it.* Revolutionary socialism, accordingly, repudiates the policy of introducing socialism by means of legislative measures on the basis of the bourgeois State. This State is a bourgeois State, the organ for the coercion of the proletarian by the capitalist; how, then, can it introduce socialism? As long as the bourgeois parliamentary State prevails, the capitalist class can baffle the will of the proletariat, since all the political power, the army and the police, industry, and the press are, in the hands of the capitalists, whose economic power gives them complete domination. The revolutionary proletariat must expropriate all these by the conquest of the power of the State, by annihilating the political power of the bourgeoisie, before it can begin the task of introducing socialism.

*"Revolutionary socialism, accordingly, proposes to conquer the power of the State.* It proposes to conquer by means of political action,—political action in the revolutionary Marxian sense, which does not simply mean parliamentarism, but the *class action* of the proletariat *in any form* having as its objective the conquest of the power of the State. *   *   *

"Parliamentarism cannot conquer the power of the State for the proletariat. The conquest of the power of the State is an extra-parliamentary act. It is accomplished, not by the legislative representatives of the proletariat, but by *the mass power of the proletariat in action.* The supreme power of the proletariat inheres in the *political mass strike,* in using the industrial mass power of the proletariat for political objectives.

"Revolutionary socialism, accordingly, recognizes, that the supreme form of *proletarian political action* is the *political mass strike.* Parliamentarism may become a factor in developing the mass strike; parliamentarism, if it is revolutionary and adheres to the class struggle, performs a necessary service in mobilizing the proletariat against capitalism.  *  *  *

"The older unionism was implicit in the skill of the individual craftsmen, who united in craft unions.  These unions organized primarily to protect the skill of the skilled workers, which is in itself a form of property.  The trades unions developed into 'job trusts,' and not into militant organs of the proletarian struggle; until to-day the dominant unions are actual bulwarks of capitalism, merging in imperialism and accepting State capitalism.  The trades unions, being organized on craft divisions, did not and could not unite the workers as a class, nor are they actual class organizations.  *  *  *

"The revolution starts with strikes of protest, developing into mass political strikes and then into revolutionary mass action for the conquest of the power of the State.  Mass action becomes political in purpose while extra-parliamentary in form; it is equally a process of revolution and the revolution itself in operation.

"The final objective of mass action is the conquest of the power of the State, the annihilation of the bourgeois parliamentary State and the introduction of the transition proletarian State, functioning as a revolutionary dictatorship of the proletariat.

### Dictatorship of the Proletariat.

"The attitude toward the State divides the anarchist (and anarcho-syndicalist), the moderate socialist and the revolutionary socialist.  *Eager to abolish the State (which is the ultimate purpose of the revolutionary socialist),* the anarchist (and anarcho-syndicalist) fails to realize that the

State is necessary in the transition period from capitalism to socialism. The moderate socialist proposes to use the bourgeois State, with its.fraudulent democracy, its illusory theory of the 'unity of all the classes,' its standing army, police and bureaucracy oppressing and baffling the masses. *The revolutionary socialist maintains that the bourgeois parliamentary State must be completely destroyed* and proposes the organization of a new State, the dictatorship of the proletariat.

"The State is an organ of coercion.  *  *  *  *  *The revolutionary proletariat must accordingly destroy this State.* *  *  *  It is therefore necessary that the proletariat organize its own State *for the coercion and suppression of the bourgeoisie.*

"Capitalism is bourgeois dictatorship. Parliamentary government is the expression of bourgeois supremacy, the form of authority of the capitalist over the worker. The bourgeois State is organized to coerce the proletariat, to baffle the will of the masses. In form a democracy, the bourgeois parliamentary State is in fact an autocracy, the dictatorship of capital over the proletariat.  *  *  *

"The old machinery of the State cannot be used by the revolutionary proletariat. It must be destroyed. The proletariat creates a new State, based directly upon the industrially organized producers, upon the industrial unions or soviets, or a combination of both. It is this State alone, functioning as a dictatorship of the proletariat, that can realize socialism.  *  *  *

"The State of proletarian dictatorship is political in character, since it represents a ruling class, *the proletariat,* which is now supreme; and it uses coercion against the old bourgeois class. But the task of this dictatorship is to render itself unnecessary; and it becomes unnecessary the moment the full conditions of communist socialism materialize. While the dictatorship of the proletariat performs its negative task of crushing the old order, it performs the

positive task of constructing the new. Together with the government of the proletarian dictatorship, there is developed a new 'government,' which is no longer government in the old sense, since it concerns itself with the management of production and not with the government of persons. Out of workers' control of industry, introduced by the proletarian dictatorship, there develops the complete structure of communist socialism,—industrial self-government of the communistically organized producers. When this structure is completed, which implies the complete expropriation of the bourgeoisie economically and politically, the dictatorship of the proletariat ends, in its place coming the full and free social and individual autonomy of the communist order. * * *

"The communist international * * * represents a socialism in complete accord with the revolutionary character of the class struggle. It unites all the consciously revolutionary forces. * * * The communist international issues its challenge to the conscious, virile elements of the proletariat, calling them to the final struggle against capitalism. * * * The acceptance of the communist international means accepting the fundamentals of revolutionary socialism as decisive in our activity. * * *

"The revolutionary epoch of the final struggle against capitalism may last for years and tens of years; but the communist international offers a policy and program immediate and ultimate in scope, that provides for the immediate class struggle against capitalism, in its revolutionary implications, and for the final act of the conquest of power.

"The old order is in decay. Civilization is in collapse. The proletarian revolution and the communist reconstruction of society—*the struggle for these*—is now indispensable. This is the message of the communist international to the workers of the world.

"The communist international calls the proletariat of the world to the final struggle!"

304—5

November 29, 1918, about three o'clock in the afternoon, Lloyd drove along State street, Chicago, flying from his automobile a large red flag and an American flag. His car was stopped in front of the Palmer House and the crowd that soon gathered began shouting, "Take that flag down!" Lloyd refused to remove the red flag from his automobile, and a police officer removed it and placed Lloyd under arrest. The flag was about three feet wide and six feet long. At the trial in the police court he was asked why he placed the American flag on his automobile and he said that he put it there as a matter of courtesy; that the red flag was his most valued flag; and that if he could not fly the red flag in this country he would go to Russia. The record shows that Lloyd is a man with considerable property and that he regularly employs a manager for his estate and financial matters. He maintains an office and an office force at 1309 Tribune building, Chicago. He is surrounded with luxuries in his home at Winnetka.

January 12, 1919, Lloyd addressed a mass meeting held in Convention hall in Milwaukee, Wisconsin. There were four or five thousand of Lloyd's "comrades" present. He began his address by saying: "Comrades, I am mighty glad to see you all here, but I am not so terrible proud of you at that. It is your own fault that you must be here tonight. You have let a bunch of plutocrats and lawyers run this country instead of workingmen. You ought to take a leaf out of the book of bolshevism on this county and judicial election." He concluded his lengthy address, in which he berated President Wilson and praised the Industrial Workers of the World and revolutionary socialists, with the following exhortation: "What we want is revolutionary preparedness. We want to organize, so if you want to put a piece of propaganda in the hands of everybody in Milwaukee you can do it in three or four hours. If you want every socialist in Milwaukee at a certain place at a certain time with a rifle in his hand or a bad egg, he

will be there. We want a mobilization plan and an organization for the revolution. You want to get rifles, machine guns, field artillery and the ammunition for it; you want to get dynamite. You want to tell off the men, who, when the revolution starts, are to take the dynamite to the armory doors and blow them in and capture the guns and ammunition there so that the capitalists won't have any. Dynamite the doors of the banks to get the money to finance the revolution."

January 4, 1920, in an interview with a newspaper reporter, which lasted about an hour, Lloyd said that the United States was facing, in his opinion, the most terrible revolution which had ever occurred in the world, a revolution which would be far more bloody than the French revolution and would eclipse the world war in the number of people killed; that the nation was making a big blunder in deporting the Reds; that for every person deported there would be at least one hundred to take his place; that the hope of the government to avert the revolution by deporting the so-called leaders was futile, because revolution made leaders, and the leaders would not be known until the time for the revolution. In reply to the query, whether he thought the government would deport Haywood he said, that if the government decided he was too dangerous to stay here, the Supreme Court, which did as it pleased, might easily make it constitutional to deport a United States citizen. He said further, that the only means of solving the economic problems of this country was through revolution; that the affairs of the country and the manner in which the government had handled problems of this country had gone so far that there was no chance for the problems to be solved without a change of government and the establishment of a soviet government, built along the same lines as that of Russia; that this change would be brought about by a revolution; that the revolution would come suddenly and that it would spread all over the country like wild

fire; that the people in this country were beginning to understand the true conditions in Russia and that the government realized that a revolution was certain; that the people had learned that Russia was built upon a firm foundation of liberty and equality for everyone; that the government in this country was now of the same character as the government of Russia under the administration of the czar; that the most radical changes in the present form of government could not satisfy the millions of people in this country who were anxious to see the soviet form of government established because they knew the latter was the only form of government under which they could live with freedom of movement and equality among themselves; that violence was the only method that could now be used to overcome this government; that the government had used violence on the revolutionary socialists, and in using violence, it had stirred the people so that the people were determined to return it; that when a government of this type resorted to violence, there was always going to be a comeback; that he was a member of the communist labor party which was credited with being the reddest of the Reds, and that he agreed with the platform and program of that party.

In the fall of 1918, Owens in a letter to John Reed, a communist of New York City, outlined his plans for the education of his son, Arvid, who is a gifted musician. In the course of this letter he said: "The advantage to him of training in a place like New York as I see it, would be in the fact that he could be kept in contact with radical thought. My sole ambition for him, if it can be called an ambition, is that he shall be a rebel. I want him to be a musician of the revolution, and I feel that I could rest content if he could even in a small way give our kind inspiration that would contribute to the overthrow of this god damned system that makes slaves and prostitutes of the masses. I'm fairly rational about most things, but when I get to thinking about the part I want that kid to play in

the revolution, I get sort of batty." Further on in this letter he characterized the proposed revolution as "the real thing." He wrote: "I was at Rockford September 15 and called on Lewis but he was out of town. I think that even Lewis got a jolt or two the Sunday we spent there and I am inclined to believe he is not so certain that the revolution is going to be such a fine thing after all. He is a spendid type of the idealist, but he seems to lack all conception of the purpose of a revolution. In the discussion that evening the effects of revolution on his kind was made pretty plain to him, and I got a hunch he is not so certain that it is not to be a pink tea affair. You made it pretty plain that the parlor revolutionist fails to function when the bell rings and I feel sure that Lewis has done some serious thinking about it since our session. But what did me the most good was the jolts handed to the sky pilot. Here was a guy, a shepherd who was going to lead us out of all our trouble without any troublesome trouble, and when he learns that his kind are so much ballast that impedes the progress of the revolution when it gets to going good, he most naturally tries to call a halt."

October 20, 1919, he wrote, "Dear comrade Procter," that he was elated over his "optimistic report of things accomplished and in process of accomplishment in Cook county." This letter was written on the official stationery of the communist labor party, and Owens was styled "State secretary" on the letter-head. He wrote Procter regarding the business of the party and sent him some supplies.

October 16, 1919, as State secretary of the communist labor party, he sent out the following letter:

"*Dear Comrade Secretary:* The State convention of the communist labor party of Illinois was held in Rock Island Sunday, October 12, 1919. We herewith send you a report of the proceedings. With the holding of the State convention the communist labor party becomes a mighty factor in revolutionary progress here in Illinois. We stand four-square by the manifesto of the Third International, and will bend every effort towards establishing the

program of the communist labor party adopted at the recent national convention, which has already been sent you.

"You want to be a part of this work. You want the satisfaction of knowing that when our struggling comrades of Soviet Russia sent the call to all revolutionary elements the world over, to unite in the magnificent struggle—perhaps the final struggle—to abolish capitalism, and capture the world for the workers—you want to know that you were among those present.

"The old socialist party failed to measure up to its historic task. At the emergency convention it repudiated the Third International by a vote of 61 to 33. It speaks the language of the present governing Social Democracy of Germany, the government that assassinated Liebknecht and Rosa Luxembourg. Its program is the embodiment of social reform. In a recent official communication issued by its executive committee it boasts that 'the socialist party *believes in immediate demands.*' This in the face of the collapse of reformistic socialism from the impact of the world war. Even from such a grueling experience, the socialist party has failed to learn.

"The communist labor party maintains that the 'emancipation of the working class must be an act of the workers.' They must organize their class power; they must abolish the capitalist political state; they must make themselves the ruling class, and under their own dictatorship they must develop the instruments with which to build the new society—the Industrial Democracy. Such is the lesson of the Russian revolution.

"Petty personalities do not enter. It is a matter of basic principles. Socialists of this country must make their stand on one of these two fundamentally opposed viewpoints. And when the crisis comes—as it will—then it will be well to look back to this moment of decision to see whether our lot has been cast with the Scheidemans and social reform, or with the Liebknechts and social revolution. Comrades! The revolution calls you! Will you give heed? *Affiliate with the communist labor party.*

The World for the Workers." EDGAR OWENS, *State Secretary.*

December 4, 1919, Owens, as secretary of the Illinois-Iowa district, wrote the following communication to Ralph Faktor at Mason City, Iowa:

"*Dear Comrade:* No doubt you have received inspiration from the wonderful showing made by the striking steel workers and coal miners. Especially have the coal miners demonstrated the power that goes with solidarity. Facing the combined opposition of chambers of commerce, manufacturers' associations, ku klux clans in the shape of the white-collared mob, with these backed by the judi-

ciary, the office of the Attorney General, and even the office of the President of the United States; betrayed by the Secretary of Labor who is a member of their own union and formerly secretary-treasurer of the U. M. W. of A., they have recognized the power of solidarity and have brought the whole of capitalist society in this country to its knees. * * *

"When the issue [between the radical and moderate socialists] came to a head in the Chicago emergency convention last September the Left Wing were forced to withdraw. When Germer called in the anarchist squad of the Chicago police department to bolster up his control of the convention there was but one thing for the revolutionary Left to do. A new party was formed based upon the new conditions resulting from the world war.

"The *communist labor party is the logical development of* the Left Wing movement in this country. It accepts the principles of the Third International with which it is affiliated. It is aligned with the bolsheviki of Russia, the sparticides of Germany, and the communist socialist groups of all Europe. * * *

"A big work lies before us and all those in whose veins there flows the red blood of the revolutionist must stand shoulder to shoulder to accomplish our historic mission.

"Read the enclosed issues of the *Communist Labor Party News.* Here you will find the platform and program of the C. L. P. You will note that the tactics employed by the coal miners in their magnificent struggle against all the powers of capitalism, including the capitalist state are following the lines laid down in this program.

"There are also application cards. Meet with the other comrades, form a local and become an integral part of the movement that is destined to emancipate the workers from wage slavery. The revolution calls you! You will heed that call! Together we will carry on.      "Yours in comradeship,

EDGAR OWENS,
*Secretary Illinois-Iowa District.*"

The foregoing letters written by an official of the party give more clearly and accurately than we can state them the principles and objects and purposes of the organization which plaintiffs in error organized and are helping to maintain. For that reason it has seemed advisable to quote from them at length.

January 8, 1920, Owens was arrested at his home in Moline and his home was searched with his consent. The officers found a membership card showing that he was a charter member of the communist labor party; that he paid

dues for October, November, December, 1919, and January, 1920. They found neatly folded on top of a bookcase a large red flag, and he said to the officers, "That is our flag. We had it made for one of our conventions and used it there." The American flag was found among a lot of rubbish on the floor of a closet. One of the officers said to Owens, "This is a nice way to treat our flag," and Owens replied, "That is not our flag. That is my flag," pointing to the red flag. "Some day it will be your flag when you understand us people better."

In an interview with assistant State's attorney Lloyd D. Heth in the criminal court building in Chicago, January 8, 1920, Owens said that he was a member of the socialist party from 1906 until September, 1919; that he was elected a delegate from the Moline district to the national socialist convention in Chicago in August, 1919, and was seated in that convention; that he was a Left Winger, and together with the rest of the Left Wingers he seceded from the socialist party and met with his comrades to organize the communist labor party; that he was later elected executive secretary for the State of Illinois; that the present members of the State executive committee for Illinois were Procter, Stolar, Shipman, England and one Doering; that the communist labor party received its finances from the sale of dues stamps; that the communist labor party was affiliated with the Third International and accepted the principles of the manifesto of the Third International; that as a delegate to the communist labor convention he voted for the platform and program and that it was entirely satisfactory to him; that he believed in the soviet form of government and believed in the tactics employed by the present soviet government in Russia; that the party proposed to bring about the soviet form of government in this country through education and organization; that he believed in the use of the ballot-box to accomplish this purpose, but in addition to the ballot-box it was to be accomplished by

the workers on the job; and that might made right because an organized group of sufficient numbers had power to enforce its rule.

In an interview in the State's attorney's office Bedacht said, that he was elected a delegate to the socialist national convention held in Chicago in 1919; that he seceded from that convention and helped to organize the communist labor party; that he was familiar with the manifesto of the Third International at the time he voted for the platform and program of the communist labor party, and that when the party stated in its platform that it stood by the principles stated by the Third International formed at Moscow, it was understood that the party also stood by the governing rules of the Third International, because it could not possibly apply for admission to the Third International without subscribing to all its rules and principles. He stated that the *Communist Labor Party News* was adopted as the official paper of the party, and that he was present at a meeting of the executive committee when a "proclamation to the membership" was drafted and that the proclamation that was drafted at that meeting was later published in the official paper. This proclamation tells the membership that they have been betrayed by the socialist party and that the communist labor party was organized to take up the work that the socialist party should have done. It appeals to socialists to desert their discredited party and to join the new organization.

Certain charter members of the communist labor party decided to call a mass meeting for the purpose of perfecting an organization in Cook county. Their call was drafted, setting out at some length the objects and purposes of the party and appealing to the revolutionists of Chicago to meet at the I. W. W. hall Sunday, September 28, 1919. Plaintiffs in error Procter, Ash, Hankin, Stolar, Christensen, Meisinger, Vogel, Kjar and Krumbein participated in that meeting. The platform of the communist labor party was

adopted unanimously as the platform of the Cook county branch. The manifesto of the Third International of Moscow was read and adopted without a dissenting vote. The manifesto and governing rules of the Third or Communist International were printed in a small red-covered booklet and circulated among those who attended this convention. It was announced from the platform that copies of it could be bought, and a copy that was bought at this convention was received in evidence as State's exhibit 13. The convention decided to affiliate with the Third International. Procter, Kjar, Meisinger, Hankin, Firth, Vogel, Stolar, Ash and Krumbein were elected members of the Cook county executive committee. This committee established headquarters at Procter's bookstore at 204 North Clark street, Chicago. Meetings of the committee were held in this store, and it was from there that supplies and literature were furnished.

Officers from the State's attorney's office visited Procter's store from time to time between July 1, 1919, and January 1, 1920, and saw displayed in that store radical newspapers and other literature. Among the publications were *The Revolutionary Age, The Red Dawn, The Bolsheviki, The I. W. W., The Class Struggle, The Truth, Soviet Russia* and *The Communist Labor News.* There were also buttons having on them a picture of the red flag and a Russian inscription, application blanks, membership cards, and other literature and supplies. These were kept by Procter for sale and for free distribution. On the walls of the store were pictures of Lenine, Trotsky and other celebrated communists. There were also posters advertising radical publications. Among the articles taken from this store at the time of Procter's arrest in January, 1920, was one of the little red books containing the manifesto and governing rules of the Third or Communist International. The manifesto covers twelve pages of the printed abstract. It recites in detail the struggle of socialism, its reverses and

its successes.  It tells of the meeting of the socialist dele-·
gates from all parts of the world in convention in London
in 1864, and the organization there of the First Interna-
tional, of the organization in 1889 in Paris of the Second
International, and of the organization in March, 1919, at
Moscow, of the Third or Communist International.  The
manifesto concludes thus:

"Spurning the half-heartedness, hypocrisy and corrup-
tion of the decadent official socialist parties, we, the com-
munists assembled in the Third International, feel ourselves
to be the direct successors of the heroic efforts and martyr-
dom of a long series of revolutionary generations from
Baboeuf to Karl Liebknecht and Rosa Luxembourg.  As
the First International foresaw the future development and
pointed the way; as the Second International gathered to-
gether and organized millions of the proletariats, so the
Third International is the international of open mass-action
of the revolutionary realization, the International of Deeds.
Socialist criticism has sufficiently stigmatized the bourgeois
world order.  The task of the international communist
party *is now to overthrow this order and to erect in its*
place the structure of the socialist world order.  We urge
the workingmen and women of all countries to unite un-
der the communist banner, the emblem under which the
first great victories have already been won.

"Proletarians of all lands!  In the war against imperi-
alistic barbarity, against monarchy, against the privileged
classes, against the bourgeois State and bourgeois property,
against all forms and varieties of social and national op-
pression—*Unite!*"

The governing rules cover eight pages of the printed
abstract.  A significant paragraph is entitled, "The capture
of political power."  It reads:

"Seizure of political power by the proletariat means de-
struction of the political power of the bourgeoisie.  The
organized power of the bourgeoisie is in the civil State,

with its capitalistic army under control of bourgeois-junker officers, its police and gendarmes, jailers and judges, its priests, government officials, etc. Conquest of the political power means not merely a change in the personnel of ministries but annihilation of the enemy's apparatus of government; disarmament of the bourgeoisie, of the counter-revolutionary officers, of the white guard; arming of the proletariat, the revolutionary soldiers, the red guard of workingmen; displacement of all bourgeois judges and organization of proletarian courts; elimination of control by reactionary government officials and substitution of new organs of management of the proletariat. Victory of the proletariat consists in shattering the enemy's organization and organizing the proletarian power; in the destruction of the bourgeois and upbuilding of the proletarian State apparatus. Not until the proletariat has achieved this victory and broken the resistance of the bourgeoisie can the former enemies of the new order be made useful, by bringing them under control of the communistic structure and gradually bringing them into accord with its work."

Further along in the rules, a paragraph entitled, "The way to victory," reads:

"The revolutionary era compels the proletariat to make use of the means of battle which will concentrate its entire energies, namely, mass action, with its logical resultant, direct conflict with the governmental machinery in open combat. All other methods, such as revolutionary use of bourgeois parliamentarism, will be of only secondary significance."

In an interview with the State's attorney Kjar testified, that he was a member of the communist labor party and a member of the Cook county executive committee; that he helped to distribute the "call for mass membership convention," and helped to distribute a number of copies of

the poster received in evidence as State's exhibit 26, which we here reproduce:

**November 7th 1917**                    **November 7th 1919**

Come to Celebrate the 2nd ANNIVERSARY of the

# Bolshevik Revolution

## FRIDAY, NOVEMBER 7, 1919
### at the WEST SIDE AUDITORIUM
Corner Taylor and Racine

**Jack Carney** Member of National Executive Committee Communist Labor Party will speak in English.

Other English and Russian Speakers.

A Musical Program of REVOLUTIONARY SONGS

# The LATEST PICTURES
### OF THE

**Russian, German and Hungarian Revolutions will be shown.**

The beginning of the Russian Revolution of 1905.
The triumph of the Revolution in 1917.
Revolutionary Petrograd, Smolny Institute, the Kremlin, the Red Guard, etc.
The truth about the ''nationalization'' of women and children.
The Counter-Revolution, the Red Funeral, retreat of the Kolchak Army, etc.
HUNGARY.—The triumph of the Revolution, the Bolshevik Government, the Counter-Revolution, etc.
GERMANY.—The Revolutionary days, the Soviet of Berlin, the Red and the Black Armies, the funeral of Karl Liebknecht, etc.
    The demonstrations in New York and Chicago demanding the withdrawing of the troops from Siberia, and the raid on the Russian Soviet Bureau at New York will also be shown.

Under the Auspices of the COMMUNIST LABOR PARTY of Cook County.

**Admission 25c**                          **Commencing 8 p. m.**

Evidence was received of a general strike which was called in Seattle February 6, 1919. Harry J. Wilson, a member of an organization styling itself "The minutemen," and Ole Hanson, the mayor of Seattle, testified, that a general strike committee, composed of members of the metal trades council and the central labor council of Seattle, was organized January 6, 1919; that a shipyards strike was called January 21; that the metal trades council was a central body composed of delegates from practically all the unions of the metal and shipyard workers; that the central labor council was a central body composed of representatives from the unions of other lines of organized labor; that each of these two central bodies sent delegates to the other; that Seattle was a strongly organized city; that the plan of the general strike committee was to call a general strike and tie up transportation and the supply of food, light, heat and other necessities, thereby compelling the civil authorities to surrender the government of the city of Seattle to this committee; that the body proposed to organize a soldiers', sailors' and workingmen's council to take over the city government; that the *Union Record* was the official newspaper of organized labor in Seattle, and that it carried propaganda of this character; that about 20,000 circulars entitled, "Russia Did It," and received in evidence as State's exhibit 40, were printed and distributed among the people employed in the several industries of Seattle and among the soldiers who were to be discharged from Camp Lewis near there. We reproduce State's exhibit 40 and let it speak for itself:

# RUSSIA DID IT

SHIPYARD WORKERS—You left the shipyards to enforce your demands for higher wages. Without you your employers are helpless. Without you they cannot make one cent of profit—their whole system of robbery has collapsed.

The shipyards are idle; the toilers have withdrawn even tho the owners of the yards are still there. Are your masters building ships? No. Without your labor power it would take all the shipyard employers of Seattle and Tacoma working eight hours a day the next thousand years to turn out one ship. Of what use are they in the shipyards?

It is you and you alone who build the ships; you create all the wealth of society today; you make possible the $75,000 sable coats for millionaires' wives. It is you alone who can build the ships.

They can't build the ships. You can. Why don't you?

There are the shipyards; more ships are urgently needed; you alone can build them. If the masters continue their dog-in-the-manger attitude, not able to build the ships themselves and not allowing the workers to, there is only one thing left for you to do.

Take over the management of the shipyards yourselves; make the shipyards your own; make the jobs your own; decide the working conditions yourselves; decide your wages yourselves.

In Russia the masters refused to give their slaves a living wage too. The Russian workers put aside the bosses and their tool, the Russian government, and took over industry in their own interests.

There is only one way out; a nation-wide general strike with its object the overthrow of the present rotten system which produces thousands of millionaires and millions of paupers each year.

The Russians have shown you the way out. What are you going to do about it? You are doomed to wage slavery till you die unless you wake up, realize that you and the boss have not one thing in common, that the employing class must be overthrown, and that you, the workers, must take over the control of your jobs, and thru them, the control over your lives instead of offering yourselves up to the masters as a sacrifice six days a week, so that they may coin profits out of your sweat and toil.

Another circular that was printed and distributed in quantities was State's exhibit 41, which we reproduce:

# MUSTERED OUT!

## WHERE DO WE GO FROM HERE?

### Join the Workers, Soldiers and Sailors Council. Together we win.

Certain members of the general strike committee made speeches in which they praised the bolsheviki of Russia, declared the red flag to be the only flag to which they owed allegiance, and explained their plan to deliver the government of the city, and later of the State and nation, to the soldiers', sailors' and workingmen's council.

James A. Duncan, president of the Machinists' Local Union in Seattle and secretary of the Central Labor Council, Viola G. Crahn, a housewife and a member of the Woman's Club of Seattle and at one time president of the City Federation of Women's Clubs, and at the time of the

strike chairman of the civics committee of this federation, and A. W. Swenson, a salesman of typesetting machines, and a member of the typographical union, testified on behalf of the plaintiffs in error, that the general strike which lasted from February 6 to February 10, 1919, was a sympathetic strike; that the shipyard workers were demanding an increase in wages, and that organized labor and others thought their grievance was a just one; that the general strike committee was organized to see that the strike was conducted peaceably and as a protest; that this committee exempted from the strike, employees who provided the city with light and heat and police and fire protection; that it provided an adequate supply of milk for those who desired to buy it; that it provided eating houses where people might be fed for thirty-five cents a meal; that it provided a veterans' guard which consisted of ex-service men, designating them by a white ribbon, and placed them around the city to co-operate with the police officers in keeping order; that there was no disorder whatever during the four days the strike was in progress; that there was no intention of taking over the city government, and no effort made to do it; that the general strike committee co-operated to the fullest extent with the city government to preserve order, and to prevent suffering; that Wilson was a labor spy and that his testimony was not reliable; that Hanson was a dollar patriot and was advertising himself so that his lectures on Americanism would produce greater profits to himself; that they did not see any of the circulars received in evidence as State's exhibits 40 and 41 distributed about the city; and that the strike was in no way revolutionary in character.

Plaintiffs in error contend that the court erred in admitting proof of the acts and statements of Lloyd, Owens, Carney and England before July 1, 1919, because there was no statute of the State of Illinois then declaring such acts and statements to be unlawful. Lloyd's Milwaukee speech

304–6

and his remarks about his love for the red flag, and the letters of Lloyd and Owens written a short time prior to July 1, 1919, were clearly admissible against them for the purpose of showing their state of mind at the time they participated in the organization of the communist labor party, and to show the meaning they attached to words and phrases used in the party platform and program. These acts and statements of Lloyd and Owens clearly interpret their activity subsequent to July 1, 1919. Carney and England were delegates to the Left Wing conference in New York in June and evidence of their activities in that connection was admissible for the purpose of showing their mental attitude at the time they participated in the organization of the communist labor party two months later. A repetition of acts of the same character naturally indicates the same purpose in all of them, and so the acts of these defendants prior to July 1, 1919, were admissible, not to prove the allegations of the indictment, but to assist the court and jury in interpreting the acts of plaintiffs in error subsequent to July 1, 1919. (*Equi* v. *United States,* 261 Fed. 53, 251 U. S. 560, 40 Sup. Ct. 219; *Hermann* v. *United States,* 257 Fed. 601, 251 U. S. 558, 40 Sup. Ct. 179; *Rhuberg* v. *United States,* 255 Fed. 865.) In admitting this evidence, the trial court distinctly and repeatedly advised the jury that the testimony was admitted solely for the purpose of showing the intent, if any, of the four persons named, in advocating the doctrines which they did advocate after July 1, 1919. This caution to the jury was further emphasized by two instructions on the subject.

The communist labor party was the direct outgrowth of the Left Wing conference. The conspiracy to advocate the doctrines now advocated by plaintiffs in error, so far as this record shows, was formed in New York in June, 1919. Gitlow, Lloyd, Carney, England, and others, participated in the activities of the Left Wing conference in New

York and in the activities of the communist labor party convention in Chicago. Thirteen of the other plaintiffs in error joined this conspiracy in Chicago on or before September 1, 1919, and the other two joined the conspiracy between that time and September 28, 1919. Though the common design is the essence of the charge of conspiracy, it is not necessary to prove that the co-conspirators came together and actually agreed in terms to have that design and to pursue it by common means. If it is proven that the co-conspirators pursued, by their acts, the same object, often by the same means, one performing one part and another another part of the same, so as to complete it with a view of the attainment of the same object, the natural deduction from this proof is that they were engaged in a conspiracy to effect that object. It is not necessary to prove that the conspiracy originated with any part or all of the co-conspirators, or that they met during the process of its concoction, because every person entering into a conspiracy or common design already formed is deemed, in law, a party to all acts done by any of the parties before or afterwards, in furtherance of the common design. (*Ochs* v. *People, supra; Cooke* v. *People,* 231 Ill. 9; *People* v. *Strauch,* 240 id. 60; 3 Greenleaf on Evidence, sec. 92; 2 Wharton on Crim. Evidence,—10th ed.—1434; Roscoe on Crim. Evidence, 88.) Therefore, proof of every act done by Gitlow, Lloyd, Carney and England, at the Left Wing conference was admissible against each and every one of plaintiffs in error, because it has been clearly shown that they joined the conspiracy in Chicago two months later.

The Left Wing conference adopted *The Revolutionary Age* as its official newspaper and directed a national executive council, named by it, to draft and publish its manifesto. This manifesto was clearly admissible against Lloyd, Carney and England, because it was published by one of their co-conspirators, Gitlow, at their direction, and in the ·official newspaper named by them. There is no direct proof

that they knew what was in the manifesto before it was published or that they have read it since it was published, but it was forcibly called to their attention on the trial and they do not deny that it expresses their views, nor do they repudiate the act of Gitlow and his fellow-committeemen in causing it to be published. It was also proper to receive in evidence *The Revolutionary Age* of July 5, 1919, and all the articles published therein against all of plaintiffs in error, first, because it was published by one of the co-conspirators and thereby became the act of all the co-conspirators, and, second, because it was kept on display and for distribution by sale and otherwise in the party headquarters in Procter's store. Doctrines disseminated by this newspaper were strikingly similar to doctrines disseminated by literature received in evidence in *Spies* v. *People,* 122 Ill. 1, where the rules with respect to the admissibility of such evidence were clearly set forth. It was not necessary to prove by direct evidence that it was not Procter, the individual, but was Procter, the conspirator, who was distributing by sale and otherwise the supplies and literature from his store. The law does not require the impossible to be done. After the conspiracy was established and it was proven that Procter was one of the co-conspirators, proof of any act done by him which would further the object of the conspiracy is admissible in evidence, and it is a question of fact for the jury to determine, taking into consideration the facts proven and all the circumstances surrounding the transaction, whether Procter was acting as an individual or as one of the conspirators. Where a conspiracy is once established, every act and declaration of each member in furtherance of the common design are, in contemplation of law, the act and declaration of all the members, and are therefore original evidence against each of them. It makes no difference at what time anyone entered into the conspiracy. The newspaper and all articles here under consideration were in furtherance of the com-

mon design of the illegal organization to which all of plaintiffs in error belonged. Being the acts and declarations of some of the conspirators, they were the acts and declarations of all of them. *Spies* v. *People, supra;* Roscoe on Crim. Evidence, 387; Elliott on Evidence, sec. 2939.

The little red book styled the "Manifesto of the Communist International," and which contained the manifesto and the governing rules of this society, was properly received in evidence against all of plaintiffs in error, first, because they stated in their platform and program that they stood "by the principles stated by the Third International formed at Moscow;" second, because this document was in the hands of the delegates to the Cook county convention when they pledged themselves to stand by the principles promulgated at the convention at Moscow, and to work in harmony with the program adopted by that convention; third, because the book was on sale at the Cook county convention, and was advertised from the platform; and fourth, because the book was kept in quantities at the headquarters of the party in Procter's store for sale and distribution. There is no direct proof that the manifesto and governing rules printed in this little book are the real manifesto and governing rules that were adopted by the Third International, but they were so regarded by plaintiffs in error when they passed their resolutions at their conventions and when they offered them for sale, and so what is said in the book must be held to express their beliefs. None of plaintiffs in error denied that it was the true manifesto, and there was no evidence introduced to prove that it was not. This booklet was admissible in evidence for the same reason that Most's Science of Revolutionary Warfare was admissible in the *Spies case,* (p. 231,) and for the same reason that the Anti-War Proclamation and Program was admissible against Debs in *Debs* v. *United States,* 249 U. S. 211, 39 Sup. Ct. 252.

It is contended that the platform and program of the communist labor party was not properly received in evidence, because it does not tend to prove any of the charges in the indictment. That document says, among other things, that the party is "in full harmony with revolutionary working class parties of all countries, and stands by the principles stated by the Third International formed at Moscow;" that it is "in complete accord with the principles of communism;" that "not one of the great teachers of scientific socialism has ever said that it is possible to achieve the social revolution by the ballot;" that "although the United States is called a' political democracy, there is no opportunity whatever for the working class, through the regular political machinery, to effectively oppose the will of the capitalist class;" that it "fully realizes the crying need for an immediate change in the social system, it realizes that the time for parleying and compromising has passed, and that now it is only the question whether all power remains in the hands of the capitalist or is taken by the working class;" that it "proposed the organization of the workers as a class, the overthrow of capitalist rule, and the conquest of political power by the workers;" and that "the working class must organize and train itself for the capture of State power; this capture means the establishment of new working class machinery instead of the State machinery of the capitalists." If this does not mean the overthrow of the existing form of government in this State and nation, we do not understand the English language. The idea of property is not a modern idea, nor an idea established by reason. It arises out of the combative instincts of the species. The dog fights for his bone, the savage for his hunting grounds, and civilized man for his home. The form of government under which we live and which we have found good, and which all the civilized world is emulating, recognizes the right of property in the individual, and guarantees the protection of that right.

Plaintiffs in error advocate the overthrow of this government and the substitution of class rule. They repudiate the idea of a government "of the people, by the people, and for the people." Interpreting their language literally, they propose to organize all who have no property and by sheer force of numbers to seize the property from those who have it. They preach class hatred and class war. After we tear away the smoke screen of words, they advocate plain robbery. Men of common understanding are supposed to know the natural consequences of their acts, and plaintiffs in error must know that their program can only be carried out by killing those who resist. The plain, unvarnished truth is that the plaintiffs in error have conspired to rob and to murder. They propose a reign of terror by a self-appointed dictatorship, responsible to no one, and which holds its power by so managing affairs that it will satisfy the mob. If such a program were advocated by a few men in any community, they would be promptly arrested and punished, and no one would have the temerity to defend their acts. But plaintiffs in error seem to take the position that because their band has become so large and the nefarious doctrines they advocate have assumed worldwide proportions, it must be held to be an honest effort to reform a bad system of government. The fact that a conspiracy to commit a felony assumes tremendous proportions does not change the character of the conspiracy. Robbery is robbery, and murder is murder, whether it is done by one or a thousand. Our Federal Supreme Court has held that with people who adhere to the doctrines of plaintiffs in error, "capitalism" is synonymous with "State," and that when they appeal to the proletariat to "put down capitalism" they are advocating the overthrow by force of the government of the United States. *Abrams* v. *United States,* 250 U. S. 616, 40 Sup. Ct. 17.

We do not wish to be understood as approving the principle of "guilt by association," because it is not in harmony

with American ideals.  A fundamental principle of American jurisprudence is that "guilt is personal."  Individuals ought not to be condemned for mere membership in organizations, nor should they be held to believe in, advocate and work to accomplish every word, sentence or plank in their party platforms, because it is general knowledge that the greater part of the individuals, even the most intelligent, belonging to the republican and democratic parties, do not read carefully all of their party platforms, and that many of those who do read them do not agree with each and every party pronouncement.  There must be proof of a conscious guilt by individual action before it can be said that the individual adopts and approves the language of the party platform.  This proof is clearly present in the instant case.  Every plaintiff in error took an active part in the organization and advancement of the cause of the communist labor party.  They explained and enlarged the meaning of the party platform and program by other writings and activities.  They clearly advocated the abandonment of the idea of reforming the present form of government by the ballot route and urged its destruction and overthrow and the substitution of an entirely different form of government, if it can be dignified by calling it a form of government, by the bullet route.  The platform and program and its associated doctrines, and the literature and propaganda used to further its object, were clearly admissible against all of plaintiffs in error to show the intent of the conspirators.  The criminal quality of the common design of two or more persons resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated, and as the accused may deny any criminal intent, the question of intent becomes one of fact. (5 R. C. L. 1089.)  This question of intent, therefore, can not be ruled as a question of law, but must be submitted to the jury, and so in the end it is for the jury to determine whether or not the platform and program of the com-

munist labor party advocates the overthrow of the form of government now secured to this State by force or by other unlawful means.

Plaintiffs in error said in their special report on labor organization at their convention in September, that "elsewhere in the organized labor movement a new tendency has recently manifested itself, as illustrated by the Seattle and Winnipeg strikes, the One Big Union and Shop Committee movements in Canada and the West, and the numerous strikes all over the country of the rank and file which are proceeding without the authority of the old reactionary trade union officials, and even against their orders. This tendency, an impulse of the workers toward unity for common action across the lines of craft-divisions, if carried to its logical conclusion would inevitably lead to workers' control of industry. * * * With this purpose in view, the communist labor party welcomes and supports, in whatever labor organization found, any tendency toward revolutionary industrial unionism." In order for the jury to understand this "new tendency" which had recently manifested itself in the Seattle strike, it was necessary and proper to prove what was said and done by the leaders and directors of that strike. If the strike was no different from the hundreds of strikes occurring in other parts of the United States, there was no purpose in naming it in their report. One of the methods advocated by plaintiffs in error is the overthrow of government by the general strike, that is, they propose to starve and freeze the loyal citizens of this country into submission to their program, by shutting off all means of transportation and all sources of food, heat and light. According to the evidence introduced on behalf of the People, this was the program adopted by the general strike committee in Seattle. The testimony showed that the strike stopped the organized government of the city and that a committee of the strikers took charge of and conducted the affairs of the city in its own way. The testimony with re-

spect to the Seattle strike did not extend beyond the program plainly advocated by the party program and by the Left Wing manifesto and by the manifesto of the Communist International with respect to mass strikes as the method by which the proletariat expected to overthrow government and to take charge thereof through a proletarian dictatorship. This evidence was clearly admissible. (*People* v. *Gitlow, supra.*) Plaintiffs in error purported to understand the character of the strike and the tendency manifested by it, and it was proper to show these things in order to show what they were talking about, to explain the true import of their expression of sympathy for the strike, and to throw light on the intent of the program adopted at their convention. *Debs* v. *United States, supra.*

There are many other objections to the court's ruling on the admission of special items of evidence, but it would serve no useful purpose to consider them in detail. We have considered with care each and every objection urged by plaintiffs in error with respect to the admission and rejection of evidence, and while we do not hold that the record is free from error in this respect we do hold that no substantial error was committed. Granting that there were minor errors committed by the trial court, it does not follow that the judgment must be reversed. Plaintiffs in error make no defense on the merits. Not one of them took the stand to explain his participation in this conspiracy or his conduct in connection with it. The competent evidence in the record, in our judgment, leaves no room for the slightest doubt of the guilt of plaintiffs in error. We have affirmed judgments where the guilt of the accused was conclusively shown and there was no denial of it, where the court committed serious error in his rulings on the admission or rejection of evidence. (*People* v. *Cleminson,* 250 Ill. 135; *People* v. *Burger,* 259 id. 284; *People* v. *Jasiecki,* 301 id. 23.) No serious error occurred in the rulings of the court on this trial. As a whole, all the evidence that

was admitted was properly admitted. Whatever errors òc-
curred were minor ones in ruling on specific questions with
respect to minor details of some of the elements of the con-
spiracy. They could not possibly have affected the result.

Plaintiffs in error criticise the action of the court in giv-
ing, refusing and modifying instructions. We have read
with care all of the instructions given for the People, and
find them free from substantial error. The court's action
in refusing instructions 1, 2, 18, 18a and 18b, offered on
behalf of plaintiffs in error was right, in view of what we
have said in earlier paragraphs of this opinion. Other re-
fused instructions were fully covered by given instructions
or were properly refused because they did not state the
law correctly.

Inasmuch as plaintiffs in error have contended so earn-
estly that great injustice was done them by refusing to give
instruction numbered 18b, we shall consider it separately.
This instruction told the jury that if they believed from the
evidence that Procter was offering for sale, as an individual
bookseller, *The Revolutionary Age* dated July 5, 1919, and
that he was not keeping this publication in his bookstore for
the purpose of distributing it as a member of the communist
labor party in order to promote and further the objects of
said party, then the jury should entirely dismiss from their
consideration the fact that he kept this publication in his
bookstore, "even though the jury should also believe from
the evidence in this case that the sale of said copies of said
*Revolutionary Age,* at or about the time said Procter was
arrested on said charge, would be likely to promote and fur-
ther the object of said communist labor party." The fact
that this instruction implies that Procter and his co-defend-
ants were being prosecuted because of their membership in
the communist labor party and for promoting its objects
is alone sufficient to justify the refusal of the instruction.
Plaintiffs in error were being prosecuted for a conspiracy
to commit certain felonies defined by the statutes of this

State, and not because they held a membership in the communist labor party as such. Membership in this organization alone would not prove anything, as we have pointed out in an earlier paragraph. Active participation in furthering the objects of the organization is one of the elements of the crime charged, but we have undertaken in this opinion to make it clear that there are many elements considered together that force conviction of the guilt of these defendants, and the jury had a right to consider all of these elements. Furthermore, it having been established by the evidence that Procter and others had conspired to violate the laws of this State and that Procter was actively engaged in promoting the conspiracy, when it was shown by the evidence that he had offered and was offering for sale a publication of a character which would naturally tend to promote the conspiracy, then it was proper for the jury to consider this fact in arriving at their verdict, and on that state of the record the burden was not on the prosecution to show, as a condition precedent to its consideration, the object which Procter had in mind when he kept for sale such publication. Whether the issue of *The Revolutionary Age* found in Procter's bookstore was kept there for sale, whether it was distributed by him by sale or otherwise, and whether that particular issue of *The Revolutionary Age* was of such a character that its natural tendency would have been to further the object of the conspiracy, were questions of fact for the jury to determine from the evidence submitted; but when the jury found from the evidence that Procter was actively promoting the conspiracy charged by participating in the meetings of the directing heads of the conspiracy, by permitting his bookstore to be used as headquarters for the conspirators, by furthering the conspiracy by distributing literature and supplies to co-conspirators and others, and by otherwise actively furthering the common plan, the jury were entitled to consider any act done by Procter which did, in fact, further the common object

of the conspiracy. By the act of conspiring together the conspirators have jointly assumed to themselves as a body the attribute of individuality so far as regards the prosecution of the common design, thus rendering whatever is done by anyone in furtherance of that design the act of all. Taken by themselves the acts of a conspiracy are rarely of an unequivocally guilty character, and they can only be properly estimated when connected with all the surrounding circumstances. Standing alone, the fact that Procter permitted his bookstore to be used as headquarters would not make publications kept by him in his bookstore evidence properly admissible against the conspirators, nor would proof of the fact, without more, that he furnished from his store certain publications as propaganda to further the conspiracy make other publications kept in the store proper evidence. In view of all the facts and circumstances in the case, however, it could not be ruled, as a matter of law, that the jury must find from the evidence that Procter was keeping the seditious issue of *The Revolutionary Age* in his bookstore for sale and distribution in his capacity as conspirator, for the purpose of promoting the conspiracy, before they could consider the fact that he did keep for sale and distribution this publication, which, from the character of its contents, would naturally tend to promote the conspiracy. The jury were entitled to consider this act, with all others proven, in reaching their verdict.

Instructions numbered 4, 5, 6, 7, 8 and 9, offered on behalf of plaintiffs in error, advised the jury that in order to warrant a finding of guilty as charged in the respective pairs of counts in the indictment, "the jury must be convinced beyond a reasonable doubt from all the evidence in the case of each and both of the following propositions: (1) That two or more of the defendants, or at least one of the defendants and some other person or persons, whose name or names were unknown to the grand jury that returned this indictment, did in this county and State enter

into an agreement together to do said act; (2) that the advocacy which said agreement, if any such agreement there was, contemplated, was intended to be of such a nature that it, said advocacy, would be likely, in the usual course of natural events, to create a clear and imminent danger of bringing about the reformation or the overthrow of said representative form of government by violence, if said advocacy should not be interrupted by extraneous interference, independent of all the persons, if any, who should be engaged actively or passively in encouraging or carrying on said advocacy in any way whatever." The court modified these instructions by striking therefrom the phrase, "if said advocacy should not be interrupted by extraneous interference, independent of all the persons, if any, who should be engaged actively or passively in encouraging or carrying on said advocacy in any way whatever," and by adding thereto the phrase, "or any other unlawful means." This modification was proper. The conspiracy is complete when it is formed, and any subsequent interruption of the effort to carry out the object of the conspiracy does not affect the guilt of the conspirators. What we have said heretofore shows that it was proper to add the phrase, "or any other unlawful means," which is the language of the statute. The instruction as modified and given stated the law more favorably to plaintiffs in error than they were entitled to have it stated.

Instruction numbered 12, as offered, reads: "The court instructs the jury that to advocate, within the meaning of the law, a reformation or overthrow by violence, of the form of government now secured to the citizens of the United States and the several States by the constitution of the United States, and the constitutions of the several States, means and signifies to urge some or all of the citizens and inhabitants of the State of Illinois, by oral speech and written and printed matter, or by oral speech or written or

printed matter, to use violence as a means of bringing
about a reformation or the overthrow of said form of gov-
ernment, with the fixed intention on the part of the person
or persons, engaged in such urging, to incite said citizens
and inhabitants, first, to begin to make or to participate
in making, or in some way to encourage or to further the
making of preparations to use violence as a means of bring-
ing about or overthrowing said form of government, and,
second, when such preparations have been sufficiently ad-
vanced in the judgment of said citizens and inhabitants to
endeavor to make an actual attempt to use violence as a
means of bringing about the reformation or the overthrow
of said form of government, and to endeavor to make such
actual attempt presently after such urging, or at least at
some time near enough to the time of such urging as to
suggest to said citizens and inhabitants, that said urging is
earnest and sincere and intended to culminate in such en-
deavor and is not the mere empty and inconsiderate ut-
terance and declamations and outpourings of a person or
persons, who have no such fixed intention, but only a condi-
tional and contingent intention, that such preparations and
such endeavor should or ought to be made at some far dis-
tant time in the future, and, at said far distant time only,
if certain matters and things should occur which had not
then occurred, and which might never occur, or if certain
arrangements should be made which had not then been made
and which might never be made." The court modified this
instruction by striking from it the last half of the in-
struction which begins with the words, "and second." This
modification was clearly right. As we have said hereinbe-
fore, it is not necessary for the State to wait until there
is an actual attempt to carry out the program advocated
before the conspirators are guilty of the conspiracy to ad-
vocate. The State has a right to assume that the declara-
tions of such conspirators are sincere and are intended to
culminate in an effort to carry out their program, and that

they are not mere empty harangue and outpourings of irrational and irresponsible persons.

Instruction numbered 14, as offered, reads: "The court instructs the jury, as a matter of law, that a general strike by and on behalf of some or all of the workers in the United States, peaceably conducted, is not violence, or force, or crime, or the doing of physical injury to person or property or any other unlawful means, within the meaning of the statute of this State which, it is charged in the several counts of the indictments in this case, the defendants conspired to violate, merely because said general strike is called and conducted for the express purpose of bringing about the reformation, in the manner and form now provided by law, or the entire abolition, by means of said general strike, of the representative form of government now secured to the citizens of the United States and the several States by the constitution of the United States and the constitutions of the several States." This instruction was clearly wrong and should have been refused. The court modified the instruction by striking out the words, "is not," following the words, "peaceably conducted," and inserting in lieu thereof the words, "and without," and by inserting after the phrase, "or any other unlawful means," the words, "is not unlawful." As modified, the instruction told the jury that a general strike without violence, etc., is not unlawful within the meaning of the statute under consideration. We are not willing to concede that plaintiffs in error were entitled to the instruction as modified, because a conspiracy to overthrow the government now secured to this State by forcing the loyal people to submission by the suffering that would necessarily follow a general strike is certainly unlawful. Plaintiffs in error are in no position to complain of the instruction as modified and given, because it was favorable to their program.

Instruction numbered 19, as offered, reads as follows: "The court instructs the jury that none of the letters, re-

ceived in evidence in this case, which were written or mailed by the defendant Lloyd prior to July 1, 1919, and that none of the speeches, received in evidence in this case which were delivered by the defendant Lloyd before July 1, 1919, and that none of the remarks, if any, received in evidence in this case, which were made by the defendant Lloyd before July 1, 1919, can be used by the jury in this case as evidence which tends to prove any conspiracy charged in any count in the indictment in this case, or any allegation in any count in the indictment in this case, or that the defendant Lloyd, or any other of the defendants on trial, is guilty of conspiracy, as charged in any count in the indictment in this case." Instruction numbered 20 was substantially the same as instruction numbered 19, except that the former applied to plaintiff in error Owens. The court modified these instructions by striking therefrom the last clause, "or that the defendant Lloyd, or any other of the defendants on trial, is guilty of conspiracy, as charged in any count in the indictment in this case," and added the following clause, "but such evidence is admissible solely for the purpose of showing intent, if any." We have heretofore held, that these letters and speeches and remarks were admissible in evidence, and what we have said in that connection shows that the modification of these instructions was proper.

We have examined all of the objections of plaintiffs in error to the rulings of the court with respect to the giving, refusing and modifying of instructions, and we find that they afford no reason for a reversal, or even just criticism. It is not necessary to find that the instructions are free from error. To require absolute, literal and technical accuracy in instructions would, as a general rule, defeat the ends of justice, and bring the administration of the criminal law into disrepute and just contempt. It is sufficient when the instructions, considered as a whole, substantially present the law of the case fairly to the jury. Where it

can be said from the record that an error complained of could not reasonably have affected the result of the trial, the judgment of the trial court should be affirmed. *People* v. *Haensel,* 293 Ill. 33; *People* v. *Halpin,* 276 id. 363; *Ritzman* v. *People,* 110 id. 362.

Lloyd D. Heth and Marvin E. Barnhart, assistant State's attorneys, and Frank Comerford, appeared on behalf of the State, and each in turn participated in the examination of witnesses and in argument to the jury. Objection is made to the conduct of Comerford in his examination of certain witnesses and in his closing argument to the jury. Preparatory to producing a certain photostatic copy of an envelope mailed by Lloyd, Comerford called the court's attention to the fact that he had served notice on Lloyd and his counsel to produce the original, and called upon them to produce it in court. It is contended that this amounted to compelling Lloyd to give evidence against himself in violation of his constitutional privilege. We do not so regard it. It is also contended that the questions put to the witness Duncan on cross-examination for the purpose of showing that many members of the general strike committee in Seattle were convicts was prejudicial. The court sustained objections to most of these questions, and the criticism of counsel for pressing similar questions after the court had ruled against him is not without merit, but it was clearly not sufficient to require reversal of the judgment.

In his closing argument to the jury Comerford stamped all of the plaintiffs in error with disloyalty and appealed to the loyalty of the jurors. He pointed out to them the wholesome effect of the conviction of the Haymarket rioters thirty-two years ago, and cautioned them against a verdict of not guilty in the face of the present condition of unrest. He called their attention to the fact that the people of Chicago would wait for the coming of the dawn, as Francis Scott Key had waited, to see if the flag now flying over the criminal court building was still there. He

closed his argument by reciting to the jury the four stanzas of The Star-Spangled Banner.  During the course of the argument to the jury one of counsel for plaintiffs in error had told the jury that the red flag was not a flag of revolution but that it was a flag sacred to the workers of the world, and that it represented the blood that had been spilled by them in their fight for freedom.  It was not error to reply by pointing out what the American flag represents.  It would have been difficult to have presented this case to the jury without making reasonable comment upon the attitude of the plaintiffs in error toward the Stars and Stripes and to have refrained from touching upon the question of patriotism.  With any intelligent jury of American citizens the verdict would have been the same in this case without argument.  Arguments and statements of counsel, based upon the facts appearing in the proof, or on legitimate inference deducible therefrom, do not transcend the bounds of legitimate debate and are not to be discountenanced by the courts.  It is not improper for a prosecuting attorney to reflect unfavorably on defendant or to denounce his wickedness, and even indulge in invective within the limits of propriety, if based on evidence competent and pertinent to be decided by the jury.  (*Crocker* v. *People,* 213 Ill. 287; *People* v. *Sicks,* 299 id. 282.)  We do not mean to hold, that there was no error in any of the remarks made by the prosecuting attorney, but it is clear that his language is mild in comparison with the language used by plaintiffs in error in their denunciation of this form of government.  There was nothing in the conduct of the prosecuting attorneys that requires a reversal of this judgment.

Counsel for plaintiffs in error sought to read in their argument to the jury a decision of a judge of the district court of the United States for the district of Massachusetts, in which he held that the platform of the communist party did not teach or advocate the overthrow by force or violence of the government of the United States, and an

opinion of Secretary of Labor Wilson in which he held that the platform of the communist labor party did not teach such a doctrine. The court properly refused to permit the reading of either of these opinions for the reason that it is only proper to read to the jury decisions of the Supreme Court of this State, or decisions of other courts of last resort, or opinions from approved text books, where the decisions from other States and the law announced in the text books are not in conflict with the established law of this State. (*Wohlford* v. *People,* 148 Ill. 296.) The trial court is not obliged to allow the reading of numerous authorities to the jury or the unnecessary consumption of public time in discussing to the jury such authorities. The court has a clear right to keep the reading of law to the jury within reasonable limits. (1 Thompson on Trials,— 2d ed.—sec. 946; 16 Corpus Juris, 912.) That the court properly refused to permit the opinion of the district judge to be read to the jury is forcibly illustrated by the overruling of that decision on review by the circuit court of appeals. The communist party, like the communist labor party, has adopted the manifesto and program of the Communist or Third International. The circuit court of appeals, in reviewing said decision of the district court in *Skeffington* v. *Katzeff,* 277 Fed. 129, said, after quoting certain passages from this manifesto: "We think it would be going far afield to say that, from such statements of purpose, no reasonable man could reach the conclusion that force and violence are the necessary instrumentalities for its accomplishment, and are contemplated; and that, if consummated, it would overthrow government as now instituted. On the contrary, it seems to us that a program which advocates the disarmament of the armed forces of the existing State, the arming of the laborer and the formation of a communist army to protect the rule of the proletariat, affords substantial evidence that the communist party, of which the relators are confessed and avowed members,

teaches and advocates the overthrow of government by force and violence." This is sound law; and the opinions sought to be read as the law of this case were not sound.

Some confusion arises with respect to the verdict in this case by reason of a conflict in the laws respecting the penalty for conspiracy. Prior to July 1, 1919, the penalty for conspiracy was imprisonment in the penitentiary not exceeding five years, or a fine not exceeding $2000, or both. As the law then stood, the jury were required to fix the penalty, and the provisions of the Parole law did not apply. (*People* v. *Moses,* 288 Ill. 281.) Desiring to bring all penalties, except those excepted by the Parole act, within the terms of the Parole law, the Fifty-first General Assembly passed an act, amending a number of sections of the Criminal Code, by fixing a minimum imprisonment of one year. (Laws of 1919, p. 427.) Among the sections amended was section 46, and the penalty provided by the amendment was as follows: "Every person convicted of conspiracy at common law shall be fined not exceeding $2000, or shall be imprisoned in the county jail not exceeding one year, or shall be imprisoned in the penitentiary for a term of not less than one year and not exceeding five years, or may be so fined and so imprisoned in the county jail or penitentiary." At the same session section 46 was again amended by adding a paragraph, exempting farmers and others from the provisions of the section. Because of the confusion growing out of these two amendments, the compiler of Hurd's Statutes has carried both sections (p. 1068) into the revision of 1921.

In construing an act of the legislature, the title of the act, the objects to be accomplished, the other provisions found in connection with those under special consideration, the provisions and arrangement of the statutes which were amended, the mode in which the embarrassment was introduced, as shown by the journals and records, and the history of the legislation, may all be considered. (*Simpson* v.

*Story,* 145 Mass. 497, 14 N. E. 641; *Arnett* v. *State,* 168 Ind. 180, 80 N. E. 153; 25 R. C. L. 1040.) House Bill No. 621, which was the act to amend twenty-one different sections of the Criminal Code, including section 46, was introduced April 30, 1919, and was passed by the house May 29. The bill was amended in the senate and passed by it, as amended, June 17. The amended bill was concurred in by the house June 18, 1919. Senate Bill No. 573, which was the bill to amend section 46, by exempting farmers and others from the operation of the statute, was introduced in the senate June 10, and passed by the senate June 12. The bill was amended in the house and passed June 17. June 18, the senate concurred in the house amendments. Final legislative action on both bills took place on the same day. In compliance with the requirements of section 13 of article 4 of the constitution, all of section 46, as it then existed, was printed at length in both bills. It is plain from this narrative that the General Assembly, in passing these two amendments to section 46, intended to enact two separate and unrelated laws, the one relating to the penalty, and the other removing the activities of farmers and others from the operation of the section. Both bills were presented to the Governor for his approval. House Bill No. 621 was signed by the Governor June 28, and Senate Bill No. 573 was signed by him June 30. Plaintiffs in error contend that when the Governor signed House Bill No. 621, section 46, as it stood prior to June 28, was repealed, and that when he signed Senate Bill No. 573, the penalty provision theretofore existing in section 46 was re-enacted, and the new penalty provided by the act of June 28 was repealed. This contention is clearly contrary to the legislative intent, and we cannot sustain it. Both acts were finally passed by the General Assembly on the same day, June 18, 1919, and both acts became effective on the same day, July 1, 1919. It is a familiar rule that when the legislature enacts an amendatory statute providing that a cer-

tain act shall be amended so as to read as repeated in the amendatory act, and no change is made in the wording of the old act, such portions of the old law as are repeated, either literally or substantially, in the new act, are to be regarded as a continuation of the old law, and not the enactment of a new law on that subject. (*Svenson* v. *Hanson,* 289 Ill. 242.) The only thing presented by Senate Bill No. 573, on which the General Assembly was to act, was the amendment exempting farmers and others from the operation of section 46. If the Governor had vetoed this act, it would not have nullified the old statute repeated in the act, but it would have nullified only the amendment, and so the approval of the Governor was only of the proposed amendment and did not operate upon other portions of the statute printed in the act for the purpose of identifying the place of the amendment, and to enable the legislators and the Governor to form an opinion as to its fitness, relation to, and effect upon, the whole statute. This conclusion is fully sustained by decisions on similar questions arising in other States. (*Gordon* v. *People,* 44 Mich. 485, 7 N. W. 69; *Svennes* v. *West Salem,* 114 Wis. 650, 91 N. W. 121; *State* v. *Commissioners Elks Co.* 21 Nev. 19, 23 Pac. 935; *Small* v. *Lutz,* 41 Ore. 570, 67 Pac. 421; *Reeves* v. *Gay,* 92 Ga. 309, 18 S. E. 61; *Horn* v. *State,* 114 Ga. 509, 40 S. E. 768.) The jury were properly instructed to return their verdict in accordance with the act of June 28, 1919, (Laws of 1919, p. 428,) and the verdicts, as returned, were in proper form.

There are 2000 pages of typewritten matter in the record in this case and 485 printed pages in the briefs of plaintiffs in error. The "points and authorities" of plaintiffs in error cover 148 pages of their principal brief, and this opinion is of necessity of unusual length, though the discussion has been limited to the main points. The record is not free from error. The purpose of a reviewing court, however, is not to determine whether a record is perfect, but its

purpose is to determine whether the accused has had a fair trial under the law, and whether his conviction is based on evidence establishing his guilt beyond all reasonable doubt. (*People* v. *Cardinelli,* 297 Ill. 116.)    In view of the length of this trial, May 10 to August 2, 1920, it is remarkable that we find the record as free from error as we do.    While the examination of this record has occupied many days of our time and has entailed upon us much labor, it has been a pleasure to review a record in which the court and counsel have confined themselves strictly to the question of determining the truth of the controversy.    The trial judge exercised unusual care in his rulings, and ruled with promptness and finality, without the addition of loose talk too frequently found in the record of a trial of a criminal case. This record shows that counsel for the State understood well their province and aided the court in keeping the record free from error.    Counsel for the defense resisted vigorously every effort of the State to prove the guilt of their clients, and contended earnestly for the points urged by them and saved every conceivable question for review, and yet they never forgot for a moment that they were officers of the court.    We think it proper to commend the conduct of court and counsel in this case, because it demonstrates to the fullest extent the blessings of a form of government that guarantees to a man a fair and orderly, trial, regardless of the distasteful character of the offense with which he is charged.

There is little to be added to what we have already said. It is clear to any intelligent man that the plan and purpose advocated by plaintiffs in error contemplate the overthrow and destruction of the government of the United States, and of all the several States, not by the free action of the majority of the people through the ballot-box in electing representatives to authorize a change of government by amending or changing the constitution, but by immediately organizing the malcontents into militant groups and at the

earliest opportunity, through mass strike and force and violence, compelling the government to cease to function, and then through a proletarian dictatorship taking charge of and appropriating all property, administering it and governing through such dictatorship until such time as the proletariat is permitted to administer and govern it. They do not tell us just how this dictatorship is to be formed, but they make it quite plain that the property of the States and the nation shall be seized, and that the property of the individual citizens shall be expropriated. Their platform and program does not expressly advocate the use of weapons and physical force in accomplishing these ends, but they are chargeable with the knowledge that their aims and ends cannot be accomplished without force, violence and bloodshed, and therefore it is reasonable to construe what they advocate as intending the use of all means essential to the success of their ultimate object. They try to make us believe that their program is a peaceful one, and that when confronted with the mob in mass strike, owners, whose property was theretofore under the protection of the government, will surrender it without the use of force and violence. This is too incredible to require discussion. When they speak of revolution and the disarming of the bourgeoisie, they mean civil war. They mean to disarm the police, the organized militia, and the regular army, whose business it is to protect the property of the individual and of the State and nation, and to refute the idea that this can be done without force and violence requires but the statement of the proposition. They preach hate, not love; destruction, not construction; war, not peace. The doctrines advocated are not harmless. They are a menace. And it behooves Americans to be on their guard to meet and combat the movement, which, if permitted to progress as contemplated, may undermine and endanger our cherished institutions of liberty and equality.

From a careful examination of this record which the solemnity and importance of the results which will follow our decision demand, we are convinced that plaintiffs in error have had a fair and impartial trial, and that the jury would not have been justified, under the evidence, in returning any other verdict than the one under which plaintiffs in error were sentenced. The judgment of the criminal court of Cook county is affirmed. *Judgment affirmed.*

Separate opinion by Mr. JUSTICE CARTER:

The questions discussed in this case are so vital to our country's welfare that I feel compelled to express my views at some length in a separate opinion. At the outset I wish to state as emphatically as possible that I have no sympathy or agreement with the views that were expressed by plaintiffs in error for which they are criticised and in part upon which this conviction is based. Many of the views shown in this record to be held by them are most unwise and foolish and in my judgment are largely the result of ignorance or immature thought and the public expression of them may do harm to the country, but the question about which I am deeply exercised is whether the punishment of these people by imprisonment or any other drastic penalty is constitutional, and, moreover, whether it is the best way, from a public standpoint, to counteract the tendency of their views.

I do not agree with all the reasoning in the opinion of the court. During and since the great world war there has been much legislation, both Federal and State, on the subject discussed in this case. Indeed, the majority of our States have passed laws on this subject since the war closed, many of the acts being so nearly alike as to indicate that they have been largely drawn from a common source. Much of this legislation, in my judgment, has been the result of what might be termed war psychology, to punish the acts, and particularly the talk, of some of the enemies

of this country, who sometimes did, and quite often said, very unwise and foolish things during the progress of the war,—things that no good citizen controlled by sane thoughts would sanction. It is manifest that during the active progress of the war certain legislation might have been entirely proper 'for regulating or suppressing seditious utterances by people living in this country, whether citizens or otherwise, while it might be very shortsighted to endeavor to enforce that legislation in times of peace. The United States Supreme Court in *Schenck* v. *United States*, 249 U. S. 47, said on page 52 : "We admit that in many places and in ordinary times the defendants, in saying all that was said in the circular, would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done." The opinion in that case goes on to state that certain acts are of such a character, such as shouting Fire! in a crowded theater, that no law protecting free speech can protect the perpetrator of such acts from punishment. The opinion continues (p. 52) : "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no court could regard them as protected by any constitutional right."

The opinion of the court in this case quotes with approval a part of the reasoning of the United States Supreme Court in the case just cited, but, it seems to me, wrongly applies it to the facts in this case. The rule laid down in the *Schenck case* is a fairly safe guide as to what acts or words should be punishable as criminal sedition. It is obvious to any person that the doctrines advocated in the docu-

ments admitted in evidence in this case against plaintiffs in
error were, many of them, both unstatesmanlike and unwise
and frequently very foolish, but it seems to me that many
of such statements, under the law as it was known to exist
prior to the great war, would not have been considered un-
constitutional. It was generally conceded until after the
war began that such loose utterances, when spoken, might
better be left unpunished by the criminal laws of the coun-
try, with the belief that the good judgment of the majority
of the citizens would control the evil that might result from
any errors of statement made in such utterances, so far as
the public welfare was endangered thereby. In Cooley's
Constitutional Limitations, (6th ed. p. 510,) in discussing
the question of freedom of speech, that learned author said
(p. 527): "Repression of full and free discussion is dan-
gerous in any government resting upon the will of the peo-
ple. The people cannot fail to believe that they are deprived
of rights, and will be certain to become discontented when
their discussion of public measures is sought to be circum-
scribed by the judgment of others upon their temperance
or fairness. They must be left at liberty to speak with
the freedom which the magnitude of the supposed wrongs
appears in their minds to demand, and if they exceed all
the proper bounds of moderation the consolation must be
that the evil likely to spring from the violent discussion will
probably be less and its correction by public sentiment more
speedy than if the terrors of the law were brought to bear
to prevent the discussion." This edition of Cooley's Con-
stitutional Limitations was published in 1890. From a
reading of the standard authorities that had been published
when Cooley wrote that statement, it is obvious that under
the statutes then in force this doctrine was generally held
to be the law both by Federal and State courts.

Under the Illinois act of 1919 it would seem that the
provisions of the act were designed not so much, perhaps,

to punish those who commit violent acts to overthrow the government, but rather it was drafted for the purpose of forbidding any person who held opinions distasteful to the majority of our citizens to express those opinions. Prior to the world war the American law showed very little sensitiveness to revolutionary utterances made in times of peace. The czars of Russia, for many years prior to the overthrow of their government in that country, were so fearful of the danger arising from public utterances which seemed to counsel violent measures that the officials censored and suppressed all books and periodicals containing articles of that kind; they raided houses and seized men and their papers without process and prosecuted the citizens for their public expression of opinions or memberships in societies opposed to the government; they deported or banished many hundreds of persons holding such views. It is manifest from what has happened in Russia in recent years that such extreme legislation did not prevent utterances or action against the government. No attempt was made in the wording of this law to distinguish between the utterances of objectionable criticisms of the government made in a peaceable manner, and such utterances when made at such a time and place as to cause unnecessary excitement or riotous acts on the part of other citizens or such utterances as might be immediately dangerous to public tranquility.

The law of this State enacted in 1919 is so drastic and far-reaching in its provisions that many public utterances of the great leaders in our past history would have been punishable under its provisions. Had this law then been in force, parts of President Lincoln's first inaugural address could have been suppressed from publication. For example, when he stated therein that the institutions of this country belong to the people who inhabit it, and that "whenever they grow weary of existing government they can exercise their constitutional right of amending it or their revolutionary right to dismember or overthrow it." (Abraham Lin-

coln,—5th Const. ed.—p. 264.) Then, too, more than one statement of the Declaration of Independence,—a document which for many years has been read at our public celebrations,—could be held, under the provisions of this law, to be seditious and could be forbidden to be read publicly. The second President of this nation could have been prosecuted criminally under this law for seditious libel when he stated: "The right of a nation to kill a tyrant in cases of necessity can no more be doubted than that to hang a robber or kill a flea." (6 Works of John Adams, edited by C. F. Adams, p. 130.) The third President, Jefferson, would also have been punishable under its provisions when he said: "I hold a little rebellion now and then is a good thing and as necessary in the political world as storms in the physical." (Life and Writings of Jefferson, by Foreman, pp. 296, 297.) Any attempt to change existing laws by force, or by advocating anything that would lead to force, would be contrary to this statute. It frequently happens that persons who are trying to change existing laws, even when they are not considered in any way the leaders of thought in this country, may advocate in the heat of argument such methods as to the change that they may lead people to think that if peaceable methods fail, force is justifiable. Even the so-called conservative supporters of existing institutions and laws have been known so to lose their patience and judgment as to suggest in public meetings that lamp-posts and ropes be used, if necessary, in order to compel public officials to bring about the necessary changes in the law. This law of 1919 not only seems to be intended to prevent any acts that would attempt to change the existing laws by force but to prevent all wild or foolish talk advocating such changes, and to suppress all public utterances, whether wise or unwise, advocating changes that may result in an attempt to bring about such changes by force. Legislative enactments or decisions of courts cannot prevent people from believing that laws should be changed.

The serious question for the proper administration of law, as argued, is not so much which system is right or which system is wrong, as what is the best and wisest way to deal with the thoughts, feelings, aspirations, prejudices and idiosyncrasies of the human mind. Is there anything that can take the place of open and free discussion in a country like ours, that is controlled by public opinion? Is it better to drive such people into the woods, the corners and the dark places of the world, to conspire in silence and secretly? Is it not best to allow free discussion in this country of all public questions as to the necessity of changing laws or the form of government? In the words of Milton: "And though all the winds of doctrine were let loose to play upon the earth, so truth be in the field, we do injuriously by licensing and prohibiting to misdoubt her strength. Let her and falsehood grapple. Who ever knew truth put to the worse in a free and open encounter?" (2 Milton's Prose Works,—1871 ed. Bell & Daldy,—p. 96.) The opportunity to express one's views publicly against the possible wrong-doings or the shortcomings of government frequently satisfies the average citizen, as it seems to furnish an opportunity to let off, as it were, the extra pressure arising from the alleged wrongful acts of the government to which he is opposed. It is a well known fact that when steam from boiling water is confined in a kettle the kettle cover will make. a good deal of noise and disturbance, but if the cover is taken off, the steam will quickly disperse and the noise will cease. The enforcement of such a law as that of 1919 is almost sure to result in prosecuting anyone who gives utterance to language that the majority of the citizens believe to have a bad political tendency. There are always some people living in every community who think that the best way to prevent unwise or unpatriotic statements is to enact and enforce a law forbidding the expression of such utterances. It ought to be axiomatic that it is unwise to attempt to suppress by law the use of every kind

of objectionable speech as to governmental affairs. This statute of 1919, if strictly enforced with its present wording, may not only be used to punish disloyal acts of the citizens of this country, but may equally be used in the courts to punish citizens because they are thought to be disloyal at heart or not in sympathy with the policies of the government, and the statute can be so construed that many statements that would ordinarily not be so considered may be construed to advocate the use of force to change the government. Even the Supreme Court of the United States, by majority opinion in *Abrams* v. *United States,* 250 U. S. 616, held the language of certain circulars to advocate force when the average citizen would not think of putting any such construction on the words, holding in that decision that these words advised the use of force: "Workers of the world, Awake! Rise! Put down your enemy and mine! Yes, friends, there is only one enemy of the workers of the world, and that is capitalism." There is not a word there used to indicate by ordinary usage, it seems to me, the use of force or violence, yet the majority of the court held that it was clearly an appeal to the workers of the country to put down by force the government of the United States. The wording of the statute of 1919 is so general and lacking in clearness that it is possible for almost anyone who expresses an opinion contrary to the view of the governmental authorities to be prosecuted under it for sedition.

Most writers on constitutional law in this country, until very recent years at least, have agreed with the doctrine laid down by Cooley heretofore quoted, which is laid down substantially to the same effect in his work on Police Power, by Freund, secs. 476-478, as follows: "The doctrine that crime may under given conditions become justifiable or that it may have a tendency to arouse the public conscience should not in itself be held to constitute a crime. It is clear that an exposition of social wrong or injustice must be allowed. Nor can the necessary liberty of agitation be said

to be overstepped by appeals to sentiment rather than to reason, and if it is said that appeal to sentiment is appeal to passion and may lead to disorder and violence, it must be answered that this was always the plea upon which political agitation was formerly suppressed. Not even the fact that an adherent of the doctrine commits a crime is conclusive that the teaching of the doctrine amounts to incitement, for the crime may as well have been induced by a morbid brooding over conditions which are the cause of social discontent. * * * The constitutional guaranty of freedom of speech and press and assembly demands the right to oppose all government and to argue that the overthrow of government cannot be accomplished otherwise than by force. * * * It is probably true to say * * * that it is impossible to strike at anarchism as a doctrine without jeopardizing valuable constitutional rights." The foremost leader of public sentiment in this country for many years (President Jefferson) said in his first inaugural address: "If there be any among us who wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it." (Life and Writings of Thomas Jefferson,—Foreman,—p. 247.) Beyond doubt, the wording of this law is very unfortunate and may make trouble for many patriotic citizens who may disagree with existing conditions in public affairs.

Counsel for plaintiffs in error argue repeatedly in their briefs and at some length that the present statute of Illinois, generally termed in the briefs of counsel the Overthrow Statute, is invalid because of its uncertainty, ambiguity and repugnancy,—particularly as to three groups of words in said statute, viz., "violence or any other unlawful means," "violence and crime," and "force or violence or physical injury to person or property." It is argued that the words which make up these three respective groups

304—8

give to each group the same identical meaning; that each of the three groups of words plainly means "any unlawful means;" that tested by the proper canons of statutory construction they mean "all and every kind of unlawful means for overthrowing the government that might be devised by the enemies of the government;" that, properly construed, the meaning of these three groups of words is not limited to the word "violence." Counsel further argue that each section of said statute must be uniform and consistent with every other section as regards the meaning of the words "unlawful means" defined therein, under the reasoning of section 82 of Bishop on Statutory Crimes; that if it is a fact that the "unlawful means" defined by each of these three groups of words is identical with the "unlawful means" defined in each of the other groups, "unlawful means" must be the same in each of the first six sections of the statute, for otherwise it is not uniform and is inconsistent, and therefore the act as to the meaning of these words is invalid and void because of the uncertainty, ambiguity and repugnancy which appear between the essential words and phrases in these three groups of words. They further argue that if the statute is thus uncertain and void it is repugnant to sections 2 and 9 of article 2 of the Illinois constitution, and that the uncertainty, ambiguity and repugnancy deprive plaintiffs in error of their liberty without due process of law; and for the same reason the statute is in conflict with the fourteenth amendment to the Federal constitution, as depriving them of life, liberty or property without due process of law.

The uncertainty, ambiguity and repugnancy which it is argued by counsel for plaintiffs in error appear in these three groups of words of the so-called Overthrow Statute, counsel for plaintiffs in error urge in detail, as follows:

"1. The meaning of the word 'violence' wherever it appears in said act of the General Assembly now under consideration is uncertain and ambiguous.

"2. The meaning of the word 'violence' in each of sections 265*a* and 265*c* of said act is repugnant to the meaning of the word 'violence' in each of sections 265*b*, 265*d* and 265*e* of said act.

"3. The meaning of the phrase 'any other unlawful means' wherever it appears in said act is uncertain and ambiguous.

"4. The meaning of the phrase 'any other unlawful means' wherever it appears in said act is repugnant to the meaning of the word 'crime' wherever it appears in said act.

"5. The meaning of the word 'crime' wherever it appears in said act is uncertain and ambiguous.

"6. The meaning of the word 'crime' wherever it appears in said act is repugnant to the meaning of the phrase 'any other unlawful means' wherever said phrase appears in said act.

"7. The meaning of the word 'crime' wherever it appears in said act is repugnant to the meaning of the phrase 'physical injury to person or property,' in section 265*f* of said act.

"8. The meaning of the phrase 'any other unlawful means' wherever it appears in said act is repugnant to the meaning of the phrase 'physical injury to person or property,' in section 265*f* of said act.

"9. The meaning of the phrase 'physical injury to person or property,' in section 265*f* of said act, is uncertain and ambiguous.

"10. The meaning of each of those three groups of words in said act, to-wit, 'violence or any other unlawful means,' 'crime and violence,' 'force or violence or physical injury to person or property,' considered as groups, is repugnant to the meaning of each of the other two of those three groups of words."

I am of the opinion that these criticisms, in the main, as to the uncertainty and repugnancy of this statute are valid.

Counsel for plaintiffs in error further argue that it is not reasonable to reach the conclusion that the language of the Overthrow Statute must necessarily be such that the term "violence or any other unlawful means" is necessarily limited to such unlawful acts as create a clear, real and imminent danger to the form of government now secured to this State, and if that conclusion is reached it must necessarily be because there is some possible relation of cause and effect between the unlawful means defined by the statute and the creation of a clear, real and imminent danger to the existence of the form of government protected by the statute, and that such possible relation must be such unlawful means as those that are likely or apparently adapted to create such a clear, real and imminent danger. If it be suggested that it be necessary for the person who advocates sentiments contrary to the provisions of this statute, in order to be held punishable thereunder, to advocate that there be a real or actual effort to carry out the program advocated, it may be argued that the meaning of the word "advocate" is to "intend to induce action, either mentally or physically," and that this statute must necessarily provide that the word "advocate," as used therein, means to induce a real and actual effort to reform or overthrow the government. One can hardly conceive of an advocate who is not controlled by a real and actual intent to induce mental or physical action on the part of those who listen to him. The word "advocate" in the New York Criminal Anarchy statute, because of its association with words, was held to imply an intention to induce mental action and an acceptance of the doctrine of criminal anarchy, but in this Overthrow Statute the word is not associated with any synonymous or related words, such as were used in the New York statute. In this statute the predicate of the word "advocate" is a physical act,—that is, the reformation or overthrow of the government,—which physical act must consist of physical effort and not of mere thought or effort of the mind.

It is argued by counsel that if the word "advocate" does not have this force and effect it necessarily follows that the offense created by the Overthrow Statute· is simply the utterance of seditious words or the publication of written or printed seditious words of a limited nature; that if the statute is intended to include words, whether uttered or written, which do not imply an actual intention on the part of the advocate to bring about a real or actual effort towards the overthrow of the government, then the acts made punishable by this statute were already unlawful acts at common law in this State, and that the court's decision in this case would hold that this statute merely declares the common law offenses of spoken or written seditious words and prescribes penalties therefor.   Clearly this can hardly be the meaning of the Overthrow Statute.   If this be the meaning of the statute, then it must be held so vague and uncertain as to be repugnant both to the State and Federal constitutions.   Many years before the present statute was enacted Judge Cooley said that in discussing the question whether any statute is constitutional the question must be passed upon, having in mind what the law was at the time the constitution was enacted; that "the constitutional freedom of speech and of the press must mean a freedom as broad as existed when the constitution which guarantees it was adopted, and it would not be in the power of the legislature to restrict it unless it might be in those cases of publications injurious to private character or public morals or safety, which come strictly within the reasons of civil or criminal liability at the common law, but in which, nevertheless, the common law as we have adopted it failed to provide a remedy." (Cooley's Const. Lim.—7th ed.—615.)

Many of the publications introduced by the State on this hearing were published prior to the enactment of the Illinois Sedition law of 1919, and were admitted because, it was argued, they showed the purpose and intent of those who took part in the original publication or in spreading

them for further influence on the public. To me it appears that much of the oral testimony in this case was made up of matters which were incompetent and largely hearsay. The plaintiffs in error in this case were members of the communist labor party, whose purpose appears to have been the taking over of the government by the workers. Whether their plan is a dream or not is beside the question. Plaintiffs in error were not interested in labor unions *per se.* They believed that the good of the people could only be served by the organization of government placed in the hands of the workers. In the platform of the communist labor party a reference was made to the Seattle strike in the following words: "Elsewhere in the organized labor movement a new tendency has recently manifested itself, as illustrated by the Seattle and Winnipeg strikes: the One Big Union and Shop Committee ·movements in Canada and the West and the numerous strikes all over the country of the rank and file, which are proceeding without the authority of the old reactionary trade union officials and even against their orders. This tendency, an impulse of the workers toward unity for common action across the lines of craft-divisions, if carried to its logical conclusion would inevitably lead to workers' control of industry. * * * With this purpose in view the communist labor party welcomes and supports, in whatever labor organization found, any tendency toward revolutionary industrial unionism."

The trial court on the hearing in this case ruled that references to the Seattle strike permitted all sorts of evidence, most of it hearsay, and none of which, it seems to me, was connected directly with this case. The court permitted much testimony to be given by former mayor Hanson of Seattle concerning the Seattle strike. This strike was called by the shipyards workers in January, 1919, and in February following a general strike of all workmen in sympathy with the shipyards workers was called. Hanson

stated that in August, 1918, while he was mayor of Seattle he left that office and went to work in the shipyards, this testimony apparently being admitted to show the importance of working in the shipyards and the mayor's interest in it. The Seattle strike arose between the shipyard workers and their employers on account of wages. Hanson testified that in January he made a call at the office of the *Seattle Union Record,* a newspaper published and supported by the labor unions of Seattle. His call and the interview had at that time with representatives of the *Record* had no reference to any of the plaintiffs in error. The evidence was put in for the purpose of admitting the statement made during this interview by one of those present who had part in the management of said paper, who made the remark, referring to Roosevelt: "We are glad he is dead. He was in the way. We can now go ahead. He is out of our path." While this evidence was afterwards stricken out, it is impossible that the effect of its language on the jury was obliterated from their minds. Hanson further testified that in January, 1919, a great massmeeting of workers was held in Seattle and that immediately thereafter a riot took place; that some officers were wounded and a general arrest of men who had been attacked was made. He also testified as to another meeting held in Seattle with reference to a strike called by circulars and that four or five thousand people were present; that one of the speakers at this meeting denounced the government and said, "If we cannot overthrow it by the ballot route we will overthrow it by the bullet route." Another said, "We must unite and form one big union. * * * The time has come to overthrow the government." There is nothing in the record to show that the speakers who gave utterance to these sentiments had any connection with any of the plaintiffs in error, and I cannot understand how these utterances of men two thousand miles from this jurisdiction were shown to have any legal connection with this trial. Most of Hanson's testimony was

entirely hearsay, and so far as I can understand had no connection, directly or indirectly, with plaintiffs in error or their immediate associates. I think the admission of much of his testimony was entirely erroneous.

Other rulings of the trial court might well be considered so objectionable as to justify a reversal of this verdict, but aside from all other questions it seems to me that under the well settled rules of law, under the constitution of 1870, governing freedom of speech, this Overthrow Statute of 1919 should be considered so vague and general and so clearly against the American doctrine of freedom of speech as to be held unconstitutional.